No. 97-307

IN THE SUPREME COURT OF THE STATE OF MONTANA

1998 MT 206

STATE OF MONTANA,

Plaintiff and Respondent,

v.

SCOTT MICHAEL ABE,

Defendant and Appellant.

APPEAL FROM: District Court of the Fourth Judicial District,

In and for the County of Mineral,

The Honorable Douglas G. Harkin, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Larry D. Mansch, Public Defender Office; Missoula, Montana


For Respondent:

Hon. Joseph P. Mazurek, Attorney General; Elizabeth Horsman,

Assistant Attorney General; Helena, Montana

M. Shaun Donovan, Mineral County Attorney; Superior, Montana


Submitted on Briefs: May 7, 1998

Decided: August 25, 1998

Filed:

_____

Clerk

Justice Terry N. Trieweiler delivered the opinion of the Court.

**¶1 On February 25, 1996, defendant Scott Michael Abe was charged by information filed in the District Court of the Fourth Judicial District in Mineral County with deliberate homicide in violation of § 45-5-102, MCA. On August 23, 1996, six months after the original information was filed, the court permitted the State to file an amended information which charged Abe with deliberate homicide by accountability. Following a trial by jury, Abe was convicted of deliberate homicide by accountability. He appeals his conviction based on pretrial and evidentiary decisions of the District Court. We affirm the judgment of the District Court.**

**¶2 The issues on appeal are:**

**¶3 1. Did the District Court err when it granted the State's motion for leave to file an amended information?**

**¶4 2. Did the District Court err when it denied Abe's motion for change of venue?**

**¶5 3. Did the District Court err when it denied Abe's motion to exclude from evidence the Polar Sorel winter boots that were seized from Abe's residence?**

FACTUAL BACKGROUND

**¶6 On November 28, 1995, Chris Hansen called the Mineral County Sheriff's Department at approximately 9:27 a.m. and reported that he thought his wife, Nanette Hansen, was dying or dead from being kicked by a horse. Chris Hansen and his son, Scott Michael Abe, were present with Nanette in the Hansen barnyard in DeBorgia, Montana, when the first emergency medical personnel arrived at approximately 9:30 a.m. At that time, Nanette was face up, was not breathing, was cold and pale, had no pulse, her lips were purple, and her hair was matted with mud and manure. Nanette had no jacket on, despite the cold, and her pupils were dilated; her eyes were "glazed over," and she appeared to have been dead for some period of time.**

**¶7 Nanette was transported to the Mineral Community Hospital and officially pronounced dead at approximately 11:45 a.m. by the emergency room physician. Technically, however, she was dead on arrival with no signs of life. Based upon his observation and those of emergency medical personnel, the emergency room physician felt Nanette was dead by the time emergency medical personnel arrived in DeBorgia.**

**¶8 Chris Hansen and Nanette Hansen had been married prior to moving to Montana in 1991, divorced, and remarried in 1994. Chris Hansen was fifty-two years old and Nanette was thirty-four years old at the time of her death. The couple owned twenty acres of land in a rural setting, on which they built a house and a barn. Chris Hansen was diagnosed with multiple sclerosis in 1993 and had difficulties with his vision and balance, and could barely walk. However, witnesses testified he had previously abused Nanette.**

**¶9 In the past, Chris had raped Nanette at gunpoint, beat her, and, at one point, poured kerosene on her and threatened to light it. Nanette refused to leave Chris because she felt that, due to his disability, he needed her.**

¶10 The defendant, Scott Michael Abe, twenty-nine years old at the time of Nanette's death, had recently rejoined his father after twenty-five years with no contact. Abe visited his father on vacation in 1992 and soon thereafter moved in with Chris, Nanette, and Chris's mother in DeBorgia. Abe later lived in a rented trailer two-to-three miles from the Hansen property, within a five-minute drive.

¶11 Abe was open about his dislike of his stepmother. A co-worker of Abe testified that Abe told her that he despised Nanette for interfering with his and his father's relationship. On more than one occasion, Abe referred to Nanette in derogatory and vulgar terms and used profanity and expletives to describe her to others. In relation to Nanette, Abe told one friend that "he couldn't take it anymore," and he had had a "nervous breakdown." Abe told a co-worker that he hated Nanette for controlling his father. Abe told the same friend that he was worried that if anything happened to Chris he would not get his share of the twenty acres of land.

¶12 Abe told his closest friend, Jerry Parrick, on at least three occasions, that he had offered to kill Nanette for his father. Abe explained that he would wait until Nanette came home drunk and passed out on the couch, he would hit her with a board that had a horseshoe nailed to it, and then take her down to the barnyard and make it look like a horse accident.

¶13 Mineral County Sheriff Mickey O'Brien, with the assistance of other officers, executed search warrants on December 6, 1995, on the residences and vehicles of both Abe and Chris Hansen. They seized two homemade weapons ("saps") from Abe's car. Later, they received two additional saps made by Abe. One came from Abe's friend, Helen Johnson. Johnson testified at trial that Abe had shown her how to use the sap on a person's temple to incapacitate a person. On December 6, 1995, O'Brien also seized a pair of size eleven Polar Sorel winter boots from Abe's residence, and sent them to the State Crime Lab.

¶14 State Medical Examiner Gary Dale, M.D., performed an autopsy on Nanette on November 29, 1995. Dr. Dale found multiple traumatic injuries on her head, neck, upper front, chest, back, arms, legs, and face. Dr. Dale carefully photographed these bruises and marks, and at trial distinguished them from common artifacts of emergency medical efforts. Dr. Dale testified that the bruises on Nanette's arms and legs were consistent with grip marks. Three of Nanette's injuries were of particular note to Dr. Dale:

¶15 1. A two-inch bruise in her left temple area extending one inch past her ear;

¶16 2. A two-inch bruise, described as a "pattern injury," on her scalp below the previous bruise; and

¶17 3. A bruise with abrasion and laceration, also described as a "pattern injury," on her collarbone.

¶18 According to Dale, none of the injures to Nanette's head were severe enough to have caused her death, and they were inconsistent with injury by a horse. Dr. Dale actually traveled to the crime scene in DeBorgia, but found nothing in the barn area consistent with the "pattern injuries." He felt the "pattern injury" on the back of her head was most likely a footwear print made by a stomp.

¶19 Dr. Dale compared the blunt force weapons ("saps"), made by Abe, to the wound on Nanette's temple area. He testified that any one of the saps, or one like them, could have made a similar injury. All of the bruises were made less than six hours before Nanette's death, with the exception of an abrasion and bruise to the left of her nose and one on her knee.

¶20 Dr. Dale's internal examination revealed the cause of death: asphyxiation by plugging of Nanette's lung airways with mud and mud-like debris. Dr. Dale was not able to ascertain how many people inflicted Nanette's injuries. His opinion was that Nanette was forced face down in the muddy soil and held there until she died. He felt it was possible that the blow to Nanette's temple rendered her unconscious and that she laid in the mud and suffocated. Dr. Dale felt, based upon his findings, that the time of death was most probably about 9:30 a.m., around the time of the call to the sheriff's office.

¶21 Forensic scientist Deborah Hewitt of the State Crime Lab is an expert in fingerprint and other impression evidence. Hewitt examined Dr. Dale's photographs of the "pattern injury" on Nanette's scalp and compared it to the Polar Sorel winter boots seized from Abe's residence. Hewitt testified at trial that the scalp pattern injury was similar in element, size, and tread design to the boots seized from Abe. Like Dr. Dale, Hewitt traveled to the Hansen barnyard crime scene to see if she could find any item to explain the pattern injuries on Nanette's body. She was unsuccessful.

¶22 The Mineral County Attorney charged Abe and Chris Hansen with deliberate homicide in a single criminal information filed on February 26, 1996. After Chris Hansen moved to disqualify Judge Harkin of Department 4, the two cases were severed and Judge McLean of Department No. 1 heard Hansen's case, while Abe's case remained with Judge Harkin. Each case thereafter proceeded with a separate cause number.

¶23 On August 23, 1996, the State filed a motion for leave to amend Abe's information to formally include an alternative charge of deliberate homicide by accountability. On the same date, the District Court granted the State's motion for leave and arraigned Abe on the amended information.

¶24 Abe filed a motion to change venue on August 21, 1996. The District Court denied the motion on September 19, 1996.

¶25 On September 12, 1996, Abe filed a motion to suppress the Polar Sorel winter boots seized at his residence on December 6, 1995. The District Court denied that motion on October 10, 1996.

¶26 On October 24, 1996, a jury convicted Abe of deliberate homicide by accountability. He was sentenced to a term of sixty years in the Montana State Prison and given credit for time served to that date.

## ISSUE 1

¶27 Did the District Court err when it granted the State's motion for leave to file an amended information?

¶28 Whether to allow the amendment of an information is left to the discretion of the trial court. *See State v. Tropf* (1975), 166 Mont. 79, 88, 530 P.2d 1158, 1163. We review discretionary trial court rulings to determine whether there has been an abuse of discretion. *See May v. First Nat'l Pawn Brokers, Ltd.* (1995), 270 Mont. 132, 134, 890 P.2d 386, 388. In *Montana Rail Link v. Byard* (1993), 260 Mont. 331, 337, 860 P.2d 121, 125, we held that "[t]he standard of abuse of discretion is applied to discretionary rulings, such as trial administration issues, post-trial motions and similar rulings." (Citing *Steer, Inc. v. Department of Revenue* (1990), 245 Mont. 470, 474, 803 P.2d 601, 603-04). An information may be amended as to substance or form

**pursuant to § 46-11-205, MCA:**

(1) The court may allow an information to be amended in matters of substance <u>at any time, but not less than 5 days before trial, provided that a motion is filed in a timely manner, states the nature of the proposed amendment, and is accompanied by an affidavit stating facts that show the existence of probable cause to support the charge as amended</u>. A copy of the proposed amended information must be included with the motion to amend the information.

(2) If the court grants leave to amend the information, the defendant must be arraigned on the amended information without unreasonable delay and must be given a reasonable period of time to prepare for trial on the amended information.

(3) The court may permit an information to be amended as to form at any time before a verdict or finding is issued if no additional or different offense is charged and if the substantial rights of the defendant are not prejudiced.

(Emphasis added.)

**¶29 Abe alleges that when the District Court allowed the State to amend its original motion from a charge of deliberate homicide to deliberate homicide by accountability, it effectively allowed the State to alter the charge against Abe to fit the proof. Abe cites *Johnson v. United States* (D.C. App. 1992), 613 A.2d 1381, for the proposition that one of the protections provided to the accused by a properly drafted information is that it "protect[s] against oppressive actions of the prosecutor or a court, which may alter the charge to fit the proof." *See Johnson,* 613 A.2d at 1384. Abe maintains that the State had insufficient evidence to convict him of deliberate homicide, and that he had relied on the original information by planning an appropriate defense based on the charge of deliberate homicide. Abe argues that the District Court erred when it allowed the State six months to discover that it had incorrectly charged him and then amend the information to conform the charge to the evidence. Abe contends that the State should not have been allowed to pursue a "new" theory without an allegation of facts in the prosecutor's supporting affidavit which differed from those alleged in support of the original information. We disagree.**

**¶30 One of the Montana Legislature's purposes for enacting criminal statutes is "to give fair warning of the nature of the conduct declared to constitute an offense."**

*State v. Tower* (1994), 267 Mont. 63, 66, 881 P.2d 1317, 1319 (citing § 45-1-102(c), MCA). Montana's accountability statute provides that "[a] person is responsible for conduct which is an element of an offense if the conduct is either that of the person himself or that of another and he is legally accountable for such conduct as provided in 45-2-302, or both." Section 45-2-301, MCA. Section 45-2-302(3), MCA, provides, in part, that a person is legally accountable for the conduct of another when "either before or during the commission of an offense with the purpose to promote or facilitate such commission, he solicits, aids, abets, agrees, or attempts to aid such other person in the planning or commission of the offense."

¶31 We have held, pursuant to § 45-1-102(c), MCA, that the theory of accountability need not be included in the information. *See Tower*, 267 Mont. at 67, 881 P.2d at 1320. In *Tower,* we held that "a person is legally accountable for the conduct of another when he is an accomplice of the other person in the commission of the crime; distinctions between what used to be referred to as the 'principal' and 'accessory before the fact' have largely been abandoned." *Tower*, 267 Mont. at 67, 881 P.2d at 1320. Criminal accountability is not considered a substantive separate offense, but merely a conduit by which to find a person criminally liable for the acts of another. *See Tower*, 267 Mont. at 67-68, 881 P.2d at 1320.

¶32 Section 46-11-401(1), MCA, requires that a charging document give a

plain, concise, and definite statement of the offense charged, including the name of the offense, whether the offense is a misdemeanor or felony, the name of the person charged, and the time and place of the offense as definitely as can be determined. The charge must state for each count the official or customary citation of the statute, rule, regulation, or other provision of law that the defendant is alleged to have violated.

In this case, the original information alleged that Abe committ[ed] the crime of deliberate homicide, a felony, in violation of M.C.A. section 45-5-102 . . . [o]n the morning of Tuesday, November 28, 1995 upon land located near DeBorgia in Mineral County, Montana and known as Waterhole Tracts No. 7 and 8 . . . [by] purposely or knowingly caus[ing] the death of Nanette Hansen, a human being, by asphyxiating her through suffocation.

We have held that "no other facts need be alleged in any indictment or information against . . . an accessory, than are required in an indictment or information against

his principal." State v. Zadick (1966), 148 Mont. 296, 300, 419 P.2d 749, 751. Pursuant to our decisions in Tower and Zadick, the original information filed by the State against Abe was sufficient to duly advise him of the nature and the cause of the accusation against him, even without referring to guilt by accountability. The amended information gave Abe more notice of the State's theory of guilt than was required by our previous decisions. Therefore, we conclude that he was not prejudiced by the amendment, and the District Court did not abuse its discretion when it allowed the amendment.

ISSUE 2

¶33 Did the District Court err when it denied Abe's motion for change of venue?

¶34 Abe contends that he was denied a fair trial because the court denied his motion for a change of venue despite the local publicity generated by his trial. With regard to a change of venue, we have stated:

[A]n accused is entitled to a change of venue when it appears there are reasonable grounds to believe that the prejudice alleged actually exists and that by reason of the prejudice there is a reasonable apprehension that the accused cannot receive a fair and impartial trial.

*State v. Pease* (1987), 227 Mont. 424, 432, 740 P.2d 659, 664. A district court's decision to deny a motion for change of venue is reviewed for an abuse of discretion. *See Pease*, 227 Mont. at 433, 740 P.2d at 664.

¶35 We have held that when prejudicial pretrial publicity is alleged, the publicity must be inflammatory and create a reasonable apprehension that a fair trial is not possible before the motion is granted. *See Pease*, 227 Mont. at 433, 740 P.2d at 664. A defendant seeking a change of venue on the basis of prejudicial pretrial publicity must prove two elements: (1) that the news reports were inflammatory; and (2) that the news reports actually inflamed the prejudice of the community to an extent that a reasonable possibility exists that the defendant may not receive a fair trial. *See State v. Moore* (1994), 268 Mont. 20, 52, 885 P.2d 457, 477, *overruled on other grounds by State v. Gollehon* (1995), 274 Mont. 116, 122, 906 P.2d 697, 701. Inflammatory publicity is characterized by editorializing on the part of the media, or any calculated attempt to prejudice public opinion against a defendant, or to destroy the fairness of the pool from which a defendant's prospective jurors would be drawn. *See State v.*

*Nichols* (1987), 225 Mont. 438, 444, 734 P.2d 170, 173.

¶36 Abe contends that two specific articles were particularly prejudicial: one from the Idaho News Observer (Wallace, Idaho) entitled "Murder Most Foul"; and another from the Spokesman-Review (Spokane, Washington) entitled "Death Plot Laughed Off." The remainder of the articles, all from the Missoulian (Missoula, Montana) and the Valley Press/Mineral Independent (Superior, Montana), Abe describes as non-inflammatory but cites them as evidence of wide media interest in his high profile case.

¶37 Abe maintains that the articles were particularly prejudicial due to the small number of people in the community where the murder occurred, and their close-knit relationships. According to Abe, a fair trial was not possible in Mineral County because the publication of the articles added fuel to local discussions of the case and increased the prejudice against him that was already widespread in the community.

¶38 The District Court took into consideration the following demographic information for Mineral County when it considered Abe's motion for change of venue. As of 1995, the estimated population of Mineral County was 3626, of which approximately 70.4 percent, or 2334 people, were of voting age. Of the total population of Mineral County, only 8 percent, or 292 people, resided in and around the area known as the "West End," where Nanette Hansen lived and was killed. It is this small portion of the jury pool that Abe claims was tainted by pretrial publicity. Ninety-two percent of the population of Mineral County, however, is not part of the community in which Nanette Hansen lived and, therefore, presumably was not involved in the local discussions Abe contends were fueled by the pretrial publicity.

¶39 Furthermore, the following circulation figures applied to the papers in question in Mineral County as a whole:

1. Spokesman-Review 19 daily papers mailed

2. Idaho News Observer 60-75 daily papers sold in stores,

10-15 mailed

3. Missoulian 641 daily papers mailed, 800 Sunday

4. Valley Press/Mineral 830 weekly papers mailed

Independent

Of these four papers, only the Spokesman-Review and the Idaho News Observer contained prejudicial and inflammatory publicity, according to Abe. The total circulation of these two papers was to approximately 109 households in a county of 3626 people.

¶40 On the jury panel itself, only six out of seventy-eight potential jurors knew about facts of the case, and their knowledge was from word of mouth--not the media.

¶41 We conclude that even if the publications were inflammatory, they were not wide-spread enough in the community to generate a general belief of Abe's guilt throughout the jury pool, and that the community as a whole (Mineral County) could not have been affected to the extent that a reasonable possibility exists that Abe did not receive a fair trial.

¶42 We therefore conclude that the District Court did not err when it denied Abe's motion for change of venue.

ISSUE 3

¶43 Did the District Court err when it denied Abe's motion to exclude from evidence the Polar Sorel winter boots that were seized from Abe's residence?

¶44 The standard of review for evidentiary rulings is whether the district court abused its discretion. *See State v. Gollehon* (1993), 262 Mont. 293, 301, 864 P.2d 1257, 1263. The determination of whether evidence is relevant and admissible is left to the sound discretion of the trial judge and will not be overturned absent a showing of abuse of discretion. *See Gollehon*, 262 Mont. at 301, 864 P.2d at 1263; s*ee also State v. Stringer* (1995), 271 Mont. 367, 374, 897 P.2d 1067; *State v. Passama* (1993), 261 Mont. 338, 341, 863 P.2d 378, 380; *State v. Crist* (1992), 253 Mont. 442, 445, 833 P.2d 1052, 1054.

¶45 At trial, the State Medical Examiner told the jury that Nanette Hansen had a four-inch long hemorrhage on her scalp and the mid-back of her head. He testified that this was a patterned injury consistent with being struck by something, or being

pushed against something, that had a pattern. He concluded that if the injury to her head was caused by a foot, it would have been caused by a stomp.

**¶46 The State's forensic expert testified that the pattern injury on the back of Nanette's head was similar in element, size, and tread design to the pair of Polar Sorel winter boots that were seized from Abe's residence. The boots, therefore, played an important part in the State's case and were material to Abe's conviction.**

**¶47 Abe contends that because of a procedural error on the part of the investigating officers, the District Court erred when it did not suppress evidence of the boots.**

**¶48 On December 6, 1995, Mineral County Sheriff Mickey F. O'Brien executed a search warrant at Abe's residence with the assistance of other peace officers. O'Brien took custody of the property seized and gave Abe his receipt for the property. Following the search, Montana Criminal Investigation Bureau agent Mark J. Brady produced an official report of the search in which he stated, "[a]t the completion of the searches all items of evidence seized during the searches were taken into custody by O'BRIEN." Brady's official report then lists ten items seized from Abe's residence and Abe's signature, under which is a handwritten notation that reads:**

12/7/95 11. 1 pair Polar Sorrel [sic] winter boots size 11 (Boots seized during the time of search but did not account for it at the time receipt was signed.)

Agent Mark Brady

**¶49 Abe contends that because he was present during the search and signed a receipt which listed only ten items, and only later an eleventh item, the receipt for the eleventh item was not properly "left" with or "give[n]" to Abe. He also contends that the receipt is improper because it contains Brady's signature and not that of O'Brien, the officer to whom the warrant was addressed. According to Abe, both alleged errors are contrary to the requirements of § 46-5-227, MCA, which requires:**

Service of a search warrant is made by exhibiting the original warrant or a duplicate original warrant at the place or to the person to be searched. The officer taking property under the warrant shall give to the person from whom or from whose premises the property is taken a copy of the search warrant and a receipt for the property taken or shall leave the copy and receipt at the place from which the property was taken. Failure to leave

<u>a copy and receipt may not render the property seized inadmissible at trial.</u>

(Emphasis added.)

**¶50 Abe claims that because he was present during the execution of the search warrant, O'Brien was required, pursuant to the plain language of § 46-5-227, MCA, to give him a copy of the warrant and a receipt for the property seized. Although O'Brien eventually mailed the receipt for the boots to Abe, Abe argues that because mailing is not one of the options mentioned in § 46-5-227, MCA, it did not cure the original error. Because O'Brien gave Abe a receipt for only the first ten items and not for the boots, Abe maintains that O'Brien did not comply with § 46-5-227, MCA, and, therefore, the boots should have been excluded as inadmissible evidence.**

**¶51 Abe's second assignment of error with regard to the corrected receipt is that the addition of the eleventh item was improperly signed by Brady and not O'Brien, the officer to whom the warrant was addressed and who executed the warrant. Abe suggests that this variation raises the question about whether law enforcement officers in fact seized the boots at the time they executed the search warrant, or whether they seized the boots in some other way at some other time and simply added them to the receipt later. Abe suggests that this would explain why Brady waited more than a month to provide Abe with a copy of the corrected receipt. Abe also questions Brady's veracity and actions regarding the boots because, according to Abe, since then Brady had been suspended and otherwise sanctioned because of official wrongdoing.**

**¶52 The State maintains that the District Court did not err when it admitted the boots as evidence and found that the temporary error on the receipt for items seized did not render invalid the seizure of the boots. The State contends that the error, which was detected and corrected within twenty-four hours, did not violate Abe's substantive Fourth Amendment rights, and that even if the literal requirements of the statute were violated, the statue, by its terms, does not permit suppression of evidence that was otherwise constitutionally seized. In addition to the instruction given in § 46-5-227, MCA, that "[f]ailure to leave a copy and receipt may not render the property seized inadmissable at trial" (emphasis added), the Commission Comments to § 46-5-227, MCA, state that:**

This provision provides for specific directions as to the manner in which the search is

made and specifies that failure to give a receipt is not a defect which will render the evidence inadmissible. The intent of this provision is to provide for adequate notice to the possessor of the goods or premises by requiring a copy to be left with him or at the place where the articles or things are seized.

Furthermore, § 46-1-103(3), MCA, provides that "[a]ny irregularity in a proceeding specified by [the criminal procedure] title that does not affect the substantial rights of the accused must be disregarded." Specifically, with regard to search and seizure, § 46-5-103(1)(c), MCA, provides that "[a] search and seizure, whether with or without a warrant, may not be held to be illegal if: . . . any irregularity in the proceedings has no effect on the substantial rights of the accused." Because the purpose of § 46-5-227, MCA, is to ensure a defendant's notice of what items were removed during a search, we conclude that Abe was not prejudiced when the notice of the boots, was not "given" to him until after notice of the first ten items. An error in the manner in which notice is given is an irregularity in the proceedings that does not affect the substantial rights of the accused and, therefore, is not reversible error. The corrected receipt effectively gave Abe notice of the items seized from his home, including the boots.

**¶53 Neither did Brady's signature on the corrected receipt, instead of O'Brien's, affect Abe's substantial rights. Nowhere in § 46-5-227, MCA, is there a requirement that the receipt be signed by the officer to whom the warrant was addressed. In fact, the statue does not specifically require that a receipt have any signature at all. Accordingly, we conclude that the District Court did not err when it denied Abe's motion to suppress the Polar Sorel winter boots that were seized from Abe's residence.**

**¶54 The judgment of the District Court is affirmed.**

/S/ TERRY N. TRIEWEILER

We Concur:

/S/ J. A. TURNAGE

/S/ JIM REGNIER

/S/ JAMES C. NELSON

No

/S/ W. WILLIAM LEAPHART