

DA 07-0761

IN THE SUPREME COURT OF THE STATE OF MONTANA

2009 MT 18

STATE OF MONTANA,

        Plaintiff and Appellee,

   v.

CHARLES JAY DEVLIN,

        Defendant and Appellant.

APPEAL FROM:    District Court of the Twentieth Judicial District,
In and For the County of Lake, Cause No. DC-2006-116
Honorable Deborah Kim Christopher, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

            Jim Wheelis, Chief Appellate Defender, Tammy Hinderman, Legal Intern,
            Helena, Montana

        For Appellee:

            Hon. Steve Bullock, Montana Attorney General, Mark W. Mattioli,
            Assistant Attorney General, Helena, Montana

            Mitch Young, Lake County Attorney, Mark A. Russell, Deputy County
            Attorney, Polson, Montana

Submitted on Briefs:  October 22, 2008

Decided:  January 27, 2009

Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1    The State charged Charles Devlin in the Twentieth Judicial District Court, Lake County, with bail-jumping. Devlin filed a motion for change of venue, which the District Court denied. Thereafter, he entered into a plea agreement with the State and pleaded guilty to the charge. Devlin now appeals the denial of his motion for change of venue. We affirm the District Court's decision.

## BACKGROUND

¶2    Prior to the bail-jumping charge, the State charged Devlin in June 2006 with kidnapping, driving under the influence of alcohol or drugs, failure to provide proof of liability insurance, and obstructing a peace officer. These charges and the underlying facts are the subject of a separate appeal presently before this Court. *See State v. Devlin* (DA 07-0760).

¶3    On June 15, Devlin entered a plea of not guilty to all four charges, and the District Court scheduled an omnibus hearing for July 6. Devlin posted bond and was released from custody on the condition that he attend all scheduled court dates in person. Devlin failed, however, to appear at the omnibus hearing on July 6. As a result, the District Court issued a warrant for his arrest. In addition, the State commenced the instant action on July 25 by filing an information charging Devlin with bail-jumping, a felony, in violation of § 45-7-308(1), MCA. Devlin pleaded not guilty to this charge.

¶4    Devlin's trial on the kidnapping, DUI, no proof of insurance, and obstruction charges began on March 26, 2007; however, the District Court declared a mistrial based on improper testimony by the State's first witness. Devlin was again brought to trial in

2

April 2007, after which the jury found him guilty on the charges of kidnapping and obstructing a peace officer and not guilty on the charges of driving under the influence of alcohol or drugs and failure to provide proof of liability insurance.

¶5 On May 24, 2007, Devlin filed a motion in the present matter to change venue due to what he characterized as "inaccurate," "inflammatory," and "prejudicial" pretrial publicity. Devlin argued that the type and amount of reporting about him, combined with his and his family's notoriety in the community, made it impossible for him to receive a fair trial by an impartial jury in Lake County. In support of his motion, Devlin attached three newspaper articles from the *Lake County Leader & Advertiser*.

¶6 The first article, published August 31, 2006, reported that while being held in the Lake County Jail, Devlin had "run up a $17,816 medical bill which comes at taxpayer expense." The article contained assertions that Devlin had made repeated "false" medical complaints, and the article quoted Dr. Stephen Irwin, the Lake County Jail physician, as labeling Devlin "a manipulator supreme" and "a sociopath working the system every way possible." Dr. Irwin related that he had visited Devlin in the Missoula County Jail 20 years earlier and that Devlin's "pattern" over the years had not changed. Irwin also stated that one of the primary purposes of his job is to "make sure [Devlin] doesn't rake taxpayers over the coals." In short, the first half of the article suggested that Devlin had cost the taxpayers "more than $17,000 in less than three months" in largely unnecessary medical expenses.

¶7 On the other hand, the latter portion of the article reported Devlin's side of the story, including the fact that Devlin "maintains his innocence in any alleged faking of

3

heart attacks" and Devlin's assertion that the prosecution was trying to "discredit" him. It also related Devlin's explanation of the events underlying the pending charges against him. The article referred to Devlin's "extensive criminal background," including a "history of bail jumping," but also reported Devlin's explanation that his past crimes were attributable to post-traumatic stress disorder and his assertion that the pending charges against him were "trumped up" and "inflated."

¶8 The second *Leader* article was published March 29, 2007. This article reported on the mistrial and recited details from the prosecutor's and defense counsel's respective opening statements. In addition, the article highlighted the particular testimony by the State's first witness which had caused the mistrial—specifically, testimony that Devlin was on probation at the time of the alleged kidnapping.

¶9 The third *Leader* article, published April 19, 2007, reported that Devlin had been found guilty of the kidnapping and obstruction charges. Devlin asserts in the present appeal that this article inaccurately summarized the trial testimony and the attorneys' respective arguments. Furthermore, Devlin points out that the article incorrectly reported that he faced 2 to 10 years imprisonment. (The State was seeking to treat Devlin as a persistent felony offender under § 46-18-502, MCA, which carries a sentence of up to 100 years.) According to Devlin, the *Bigfork Eagle* carried this same story.

¶10 Aside from these articles, Devlin contended in his motion that a local radio station and local television stations had reported similar details concerning the mistrial, the retrial, and the verdicts in the kidnapping case. Moreover, in response to the State's acknowledgement that "the press coverage may contain some factual errors," Devlin

4

argued in his reply brief that the reporting "went far beyond that." He pointed out that the articles contained references to his prior criminal record, and he contended that the problems he had experienced arising out of his service in Vietnam had been reported in a "sensational manner."

¶11 The District Court summarily denied Devlin's motion, and the matter proceeded to trial on July 23, 2007. At the outset, the court granted Devlin's request to conduct individual voir dire. The first juror, Susan, stated that she did not know Devlin or his family personally or professionally and that she was not aware of the mistrial in the kidnapping case. She did indicate, however, that she had read about the kidnapping case in the newspaper and had seen news reports on television about this matter. Moreover, she stated that her son was the news director for the local radio station and that she had heard things from him related to the case. Although she could not remember any particular details about the charges against Devlin, Susan acknowledged that she probably would remember more as the trial progressed.

¶12 Defense counsel moved the court to excuse Susan. He argued that because Susan had stated she watches the television news "nightly" and reads each edition of the newspaper "cover to cover," she necessarily had read and heard reports related to Devlin and the kidnapping case. Counsel contended that this information was "somewhere in her mind" and that it constituted "a potential bias and prejudice" against Devlin. The District Court, however, responded that it would not "assume, on the basis of the fact that someone represents that they see the news, that they then, by virtue of that, are prejudiced." Moreover, the court reasoned that under defense counsel's argument, "no

5

juror could ever sit on any case because there is always the possibility that they might have heard something somewhere." The court stated that it would not allow a challenge for cause based on the responses elicited from Susan thus far.

¶13 Figuring that other members of the venire had heard or read about Devlin's case, and in light of the court's ruling with respect to Susan, defense counsel requested time to consult with Devlin. Shortly thereafter, counsel informed the court that Devlin would be changing his plea to guilty pursuant to a plea agreement reached with the prosecution. The District Court accepted Devlin's plea and, on October 4, 2007, sentenced him as a persistent felony offender to the Montana State Prison for a term of 20 years with 15 years suspended, said sentence to run concurrently with the sentences imposed for the kidnapping and obstruction charges. Devlin now appeals.

## ISSUE

¶14 Devlin raises the following issue on appeal: Did the District Court abuse its discretion when it denied Devlin's motion for change of venue?

## STANDARD OF REVIEW

¶15 We review for abuse of discretion a trial court's ruling on a motion for change of venue. *See State v. Link*, 194 Mont. 556, 558, 640 P.2d 366, 367 (1981); *State v. Moore*, 268 Mont. 20, 51, 885 P.2d 457, 477 (1994), *overruled in part on other grounds*, *State v. Gollehon*, 274 Mont. 116, 121-22, 906 P.2d 697, 700-01 (1995). A court abuses its discretion if it acts arbitrarily without the employment of conscientious judgment or exceeds the bounds of reason, resulting in substantial injustice. *State v. Mackrill*, 2008 MT 297, ¶ 37, 345 Mont. 469, 191 P.3d 451. Moreover, in exercising its discretion, the

6

court is bound to uphold the defendant's constitutional right to a trial by an impartial jury. *See Moore*, 268 Mont. at 51, 885 P.2d at 477 ("Criminal defendants have a constitutional right to a trial by an impartial jury, and failure to provide an impartial tribunal is a violation of due process."); *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S. Ct. 1639, 1642 (1961) ("In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process."). The burden to demonstrate an abuse of discretion is on the party seeking reversal of an unfavorable ruling. *State v. Price*, 2006 MT 79, ¶ 17, 331 Mont. 502, 134 P.3d 45.

**DISCUSSION**

¶16    Section 46-13-203(1), MCA, states that the defendant or the prosecution may move for a change of place of trial on the ground that "there exists in the county in which the charge is pending such prejudice that a fair trial cannot be had in the county." In *Link*, this Court addressed the showing that must be made before a change of venue is proper. We rejected as "unworkable" the proposition that a defendant must show it is "impossible" to obtain a jury free from prejudice, concluding instead that the defendant is entitled to a change of venue " 'when it appears there are reasonable grounds to believe that the prejudice alleged actually exists and that by reason of the prejudice there is a reasonable apprehension that the accused cannot receive a fair and impartial trial.' " *See Link*, 194 Mont. at 558-60, 640 P.2d at 367-68 (quoting *People v. Berry*, 226 N.E.2d 591, 593 (Ill. 1967)); *accord Vernon Kills On Top v. State*, 2000 MT 340, ¶ 55, 303 Mont.

7

164, 15 P.3d 422. This standard requires a fact-specific inquiry by the court and, necessarily, fact-specific proof by the moving party.

¶17    We have tailored the standard to situations in which a change of venue is sought on the ground of prejudicial pretrial publicity. The movant must show that the publicity complained of was inflammatory and that the publicity actually inflamed the prejudice of the community to such an extent that a reasonable possibility exists the accused may not receive a fair and impartial trial. *State v. Ritchson*, 199 Mont. 51, 54, 647 P.2d 830, 832 (1982); *accord Moore*, 268 Mont. at 52, 885 P.2d at 477; *State v. Abe*, 1998 MT 206, ¶ 35, 290 Mont. 393, 965 P.2d 882. The first element of this test focuses on the nature of the publicity itself, while the second focuses on its effect. *Ritchson*, 199 Mont. at 54, 647 P.2d at 832.

¶18    In the present case, Devlin and the State dispute whether the news reports were inflammatory. In Devlin's view, the three *Leader* articles and the similar reports in the *Bigfork Eagle* and on television and radio "went far beyond the objective dissemination of background facts about the case" and served no purpose other than to "incense the local community" and "prejudice the jury pool against Devlin." Devlin contends that Dr. Irwin's statements—e.g., that Devlin is "a manipulator supreme" and "a sociopath working the system every way possible" (*see* ¶ 6, *supra*)—were inflammatory and improper under *State ex rel. Coburn v. Bennett*, 202 Mont. 20, 655 P.2d 502 (1982) (discussed below). According to Devlin,

> the *Leader*'s coverage in this case left its readers believing that Devlin, a
> career criminal and sociopath who kidnapped a young girl and stripped her
> naked for his sexual gratification and who had been "rak[ing] the local

taxpayers over the coals" for twenty years by faking medical conditions and manipulating the system, might "get off" with a sentence of only two-and-one-half years.

¶19 The State responds that the press coverage was "balanced." The State contends that the *Leader* articles "did not editorialize regarding [Devlin's] guilt or innocence" or "serve to inflame 'an already angry populace' " (quoting *Coburn*, 202 Mont. at 31, 655 P.2d at 507). The State acknowledges Irwin's statements in the August 31, 2006 article but argues that "the article was balanced by accounts from a deputy sheriff that Devlin 'does have some problems,' as well as by Devlin's own statements regarding his health and his criticisms of Dr. Irwin." As for the March 29, 2007 article, the State points out that it "was based primarily upon court records and public documents"; that it referred to Devlin as a "suspect" and the victim as an "alleged victim" who had been "allegedly kidnapped"; and that it contained defense counsel's explanation that Devlin was "trying to do a good turn" in picking up the girl and giving her a ride. Finally, as for the April 19, 2007 article, the State asserts that the reporting regarding Devlin's kidnapping conviction was based on trial testimony and "was not designed to inflame the community in connection with Devlin's bail jumping trial."

¶20 We have not heretofore explained what constitutes "inflammatory" publicity for purposes of the pretrial-publicity test. We have, however, indicated the types of publicity which fall on either side of the line. In *State v. Armstrong*, 189 Mont. 407, 616 P.2d 341 (1980), for example, we observed that the news articles under consideration were not "so passionate as to excite undue prejudice against the defendant." *Armstrong*, 189 Mont. at 423, 616 P.2d at 350. We further observed that the articles did not show "editorializing

9

on the part of the media or any calculated attempt to prejudice public opinion against [the defendant] or to destroy the fairness of the pool from which [the defendant's] prospective jurors would be drawn." *Armstrong*, 189 Mont. at 423, 616 P.2d at 350. Notably, this latter observation has since evolved into a "definition." *See e.g. State v. Pittman*, 2005 MT 70, ¶ 19, 326 Mont. 324, 109 P.3d 237 ("[W]e have defined inflammatory publicity as editorializing on the part of the media or a calculated attempt to prejudice public opinion against the defendant or to destroy the fairness of the pool from which the defendant's prospective jurors would be drawn."); *see also State v. Nichols*, 225 Mont. 438, 444, 734 P.2d 170, 173-74 (1987); *State v. Fuhrmann*, 278 Mont. 396, 409, 925 P.2d 1162, 1170 (1996), *overruled in part on other grounds*, *State v. Van Kirk*, 2001 MT 184, ¶ 43, 306 Mont. 215, 32 P.3d 735; *Abe*, ¶ 35. Of course, the presence or absence of editorializing is merely one factor bearing on the question of whether publicity is "inflammatory." Moreover, what the author or speaker may have intended or "calculated" when publishing the report is not necessarily what a reasonable reader or listener would have understood the report to convey. Thus, the observations in *Armstrong* do not fully encapsulate the meaning of "inflammatory."

¶21 We have also indicated that news reports which contain "factual accounts of the background of the case as well as the trial proceedings" are not inflammatory. *Fuhrmann*, 278 Mont. at 409, 925 P.2d at 1170. Similarly, in *State v. Miller*, 231 Mont. 497, 757 P.2d 1275 (1988), we concluded that the articles, which contained "factual reports of information gathered from law enforcement officials, that was limited and accurate, or from court records that were public knowledge," did not serve to inflame the

10

prejudice of the community. *Miller*, 231 Mont. at 505-06, 757 P.2d at 1280; *see also e.g. Ritchson*, 199 Mont. at 55, 647 P.2d at 832 ("The reports were factual, contained no editorializing and could not serve to inflame the prejudice of the community."). Even references to the defendant's criminal history are not inflammatory under some circumstances. *See e.g. Fuhrmann*, 278 Mont. at 409-10, 925 P.2d at 1170-71.

¶22 On the other hand, "factual" information may be reported in an inflammatory manner. If the defendant is charged with sexual intercourse without consent and has a prior conviction for this offense, characterizing him in the media as a "serial rapist" may be inflammatory. Moreover, the reporting of "factual" information may be inflammatory in light of the particular circumstances. For instance, we have said that "[e]xtrajudicial statements by prosecutors and law enforcement personnel prejudicial to defendant and which are disseminated in the news media prior to trial may under some circumstances destroy the impartiality of prospective jurors." *State v. Williams*, 185 Mont. 140, 146, 604 P.2d 1224, 1227 (1979). In *State v. Paisley*, 204 Mont. 191, 663 P.2d 322 (1983), after the defendant's trial on a misdemeanor charge in justice court, but prior to his trial on felony charges in district court, the newspaper quoted the justice court judge as stating to the defendant: "The evidence presents you as being guilty of more than the particular offense charged." *Paisley*, 204 Mont. at 194-95, 663 P.2d at 324. The newspaper also reported that the judge "said he was amending the formal charge to include misdemeanor charges against Paisley that could have resulted from the incidents detailed in the testimony of the witnesses," who were the alleged victims of the pending felony charges.

11

*Paisley*, 204 Mont. at 195, 663 P.2d at 324. We concluded that this and the other publicity were inflammatory. *See Paisley*, 204 Mont. at 195, 663 P.2d at 324.

¶23 In *Coburn*, the defendant was charged with aggravated kidnapping and sexual intercourse without consent. Bail was first set at $100,000, but the district court reduced it to $15,000, which the defendant posted, after which he was released. *See Coburn*, 202 Mont. at 22, 655 P.2d at 503. This prompted outrage in the community. Angry citizens marched on the courthouse; public meetings were held; organizations were established devoted to removing the district court judge and to dealing with persons who commit sex crimes; vandalism occurred; and threats were made against the defendant. *See Coburn*, 202 Mont. at 30, 655 P.2d at 507. The local newspaper reported on all of these events, detailing much of the evidence gathered by investigators and tying that evidence to the defendant. In addition, some articles gave quoted statements by the Sheriff, the County Attorney, and a Deputy County Attorney that were prejudicial to the defendant—e.g., the County Attorney's remark that "The bail in serious crimes must be set sufficiently high to insure that the *defendant* is not going to *commit any more crimes* against our citizens while awaiting trial on the former charge." *See Coburn*, 202 Mont. at 22-29, 655 P.2d at 503-06. After reciting the contents of the newspaper articles, we concluded that the newspaper had gone "beyond an objective dissemination of information. Instead of calming an enraged community and providing an atmosphere in which the processes of justice could go forward without bias, the [newspaper] inflamed an already angry populace." *Coburn*, 202 Mont. at 30-31, 655 P.2d at 507.

12

¶24    The point to be taken from these cases is that the pertinent question in determining whether publicity is "inflammatory" is not simply whether the media reports contain "editorializing," whether they were "calculated" to achieve a sinister purpose, or whether they report "factual" information.  Although these are relevant factors, the focus must be on the publicity's likely effect on the jury pool.  Thus, we take this opportunity to clarify the meaning of "inflammatory" publicity for purposes of the pretrial-publicity test.  "Inflammatory" publicity is publicity which, by its nature, has the tendency to stir up in the community pervasive and strong passions of anger, hatred, indignation, revulsion, and upset such that there are reasonable grounds to believe that jurors chosen from this community could not determine the defendant's guilt or innocence in a fair and unbiased manner and based solely upon the evidence admitted at trial.  Clearly, this determination must be made based on extant circumstances including, but not limited to, the size of the jury pool, the nature of the offense charged, the type and content of the media reports, the readership of the publication, the relative size of the radio or television audience, the time lapse between the publicity and the trial, whether the reports appear to take a position on the defendant's guilt, whether the reports contain extrajudicial statements by prosecutors or law enforcement personnel that are prejudicial to the defendant, and whether there is any ostensible adverse community reaction to the publicity.

¶25    In the present case, we conclude that Devlin failed to meet this standard.  For one thing, he presented no evidence concerning the size of the jury pool, the readership of the *Leader* and *Eagle* within that community, and the size of the radio and television audiences.  *Cf. Abe*, ¶¶ 36-39.  There also is no evidence that the community was already

13

incensed over the events surrounding the bail-jumping charge when the news reports were published. Along these same lines, there is no evidence that the community was particularly reactive or sensitive to reports concerning Devlin and the charged offense. In short, there is no evidence by which to gauge the content and saturation of the news reports in the relevant jury pool. Yet, in evaluating whether publicity is inflammatory, it is critical to know whether the news reports are being heard or read by prospective jurors and whether that audience is predisposed to be enraged or incensed by the reports.

¶26 Turning to the content of the news reports at issue here, we first note that some of the arguably inflammatory information was provided by Devlin himself, such as his claim (reported in the August 31, 2006 article) that while serving in Vietnam, he had "more than 50 confirmed kills -- and about half of them were children." *Cf. Nichols*, 225 Mont. at 444, 734 P.2d at 174 ("Since much of the negative publicity was actually factual and originated from defendant himself, he cannot now successfully contend that the charges against him should be dropped because of the publicity surrounding his trial."). In any event, we agree with the State that even if the *Leader* articles could be characterized as "slanted" against Devlin, they were not as one-sided as Devlin suggests, given that they included Devlin's side of the story (as related through Devlin or defense counsel).

¶27 Devlin points out that the articles contained references to his prior criminal record and the fact that he was on probation. We agree that a jury is not to consider evidence of other crimes, wrongs, or acts unless certain prerequisites are met. *See State v. Matt*, 249 Mont. 136, 142-43, 814 P.2d 52, 56 (1991); M. R. Evid. 404(b). However, while the

14

references to Devlin's criminal record are troubling, such references are not inflammatory per se. *See Fuhrmann*, 278 Mont. at 409-10, 925 P.2d at 1170-71. Rather, as noted, the focus is on the publicity's likely effect on the jury pool, and Devlin has not persuaded us that the references to his criminal record had the tendency to inflame prospective jurors to such an extent that they could not determine his guilt or innocence impartially and based solely on the evidence admitted at trial.

¶28 Devlin also points out that the remarks made by Dr. Irwin and quoted in the August 31, 2006 article (to the effect that Devlin is a "manipulator" and a "sociopath" who is costing Lake County taxpayers thousands of dollars to pay for his frivolous medical claims) "were not conducive to the creation of an atmosphere in which the process of justice could proceed without bias and in which the presumption of innocence was sacred." We agree that the remarks were not "conducive" to such an atmosphere. Yet, while we do not condone the sort of character attack Dr. Irwin provided to the *Leader*, the media's regurgitation of such pontification from willing and opinionated talking heads—a price we pay for a free press—is not inflammatory per se.

¶29 Again, the focus is on the publicity's likely effect on the jury pool. Here, we conclude that Dr. Irwin's remarks and the insinuations that Devlin had faked his medical complaints, as well as the references to his criminal record and the errors in recounting the trial testimony and the potential sentence Devlin faced—when considered at face value and in conjunction with the remainder of the articles—simply do not rise to the level of "inflammatory" publicity. In other words, we cannot say that the publicity of which Devlin complains had the tendency to stir up in the community pervasive and

15

strong passions of anger, hatred, indignation, revulsion, and upset such that jurors chosen from this community could not determine Devlin's guilt or innocence in a fair and unbiased manner and based solely upon the evidence admitted at trial.

¶30    Finally, it bears repeating that a motion for change of venue requires a fact-specific inquiry by the court and, necessarily, fact-specific proof by the moving party. In concluding that the pretrial publicity at issue here was not inflammatory, we consider the entire record before us. Accordingly, our conclusion is informed by Devlin's utter failure to demonstrate that the publicity actually inflamed the prejudice of the community to such an extent that a reasonable possibility existed he would not receive a fair and impartial trial. "[S]omething beyond bare allegation is required to prove that the community is actually infected with prejudice." *Link*, 194 Mont. at 560, 640 P.2d at 368. We have approved the use of an affidavit stating facts in support of the prejudice alleged, or a survey of the opinions of prospective jurors regarding the defendant's guilt. *See e.g. Paisley*, 204 Mont. at 193-94, 663 P.2d at 323-24; *Coburn*, 202 Mont. at 30, 655 P.2d at 507; *see also Fuhrmann*, 278 Mont. at 410, 925 P.2d at 1171. We have also considered newspaper articles, *see e.g. Coburn*, 202 Mont. at 22-29, 30-31, 655 P.2d at 503-06, 507, as well as demographic information and circulation figures, *see e.g. Abe*, ¶¶ 36-41. In addition, voir dire is a primary method of demonstrating that potential jurors have been so affected by pretrial publicity that they would be unable to render a fair and impartial verdict. *See e.g. Nichols*, 225 Mont. at 444, 734 P.2d at 173; *Miller*, 231 Mont. at 506-07, 757 P.2d at 1281; *see also Coburn*, 202 Mont. at 32-33, 655 P.2d at 508.

16

¶31 Here, Devlin provided no surveys or affidavits. He provided newspaper articles but no demographic information or circulation figures. He points out that 21 of 39 potential jurors in his kidnapping trial were "exposed" to the pretrial press coverage, and he reiterates his belief that the coverage was "inflammatory and prejudicial." Yet, he made no such showing with respect to the bail-jumping trial. (As noted, only one member of the venire participated in individual voir dire before Devlin decided to change his plea.) More importantly, even if roughly half the venire in the bail-jumping case was likewise "exposed" to pretrial press coverage, exposure to pretrial press coverage—even coverage that is slanted or inflammatory—does not in itself establish that the jury pool is so inflamed and prejudiced that any juror drawn from the pool would be unable to render a fair and impartial verdict based on the evidence presented in court. *See Link*, 194 Mont. at 559, 640 P.2d at 367 (stating that prejudice does not arise from publication alone and that an attempt must be made to assess the effect of the publicity on the prospective jurors).

¶32 In this regard, Devlin emphasizes that he is required to show only a "reasonable possibility" that he may not receive a fair trial due to prejudicial pretrial publicity. *See Abe*, ¶ 35; *Pittman*, ¶ 17. Yet, such a showing requires evidence indicating that the prospective jurors could not set aside what they have heard or read in the media and decide the defendant's guilt impartially and based solely on the evidence admitted at trial. This Court has stated that "jurors' knowledge of the case and publicity, without more, is insufficient to warrant a change of venue since it cannot be equated with prejudice."

*Fuhrmann*, 278 Mont. at 409, 925 P.2d at 1170. Moreover, the Supreme Court has said that

> [i]t is not required . . . that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. *It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.*

*Irvin*, 366 U.S. at 722-23, 81 S. Ct. at 1642-43 (emphasis added); *but see Patton v. Yount*, 467 U.S. 1025, 1031, 104 S. Ct. 2885, 2889 (1984) ("[A]dverse pretrial publicity can create such a presumption of prejudice in a community that the jurors' claims that they can be impartial should not be believed.").

¶33 These principles are reflected in some of our prior decisions. *See e.g. Moore*, 268 Mont. at 54, 885 P.2d at 478-79 ("The jurors were questioned about their exposure to pretrial publicity. While most indicated they had read or heard something about the case, they all stated they would base their decisions only upon the evidence they received from the witnesses and exhibits presented at trial."); *Ritchson*, 199 Mont. at 55, 647 P.2d at 832 ("Here, all the jurors empaneled stated under oath they could return a verdict based solely on the evidence which belies the statement that all Powell County juries are unalterably prejudiced by the conditions at the prison."); *Armstrong*, 189 Mont. at 422, 616 P.2d at 350 ("Armstrong has not indicated that the voir dire examination of prospective jurors disclosed any prevalent opinion against him in the community or

18

among the panel members, nor any overriding prejudice which the prospective jurors could not put aside.").

¶34 The same evidentiary shortcomings exist in the case at hand. Devlin had the opportunity through individual voir dire to ferret out any bias or prejudice caused by the allegedly inflammatory pretrial publicity. He failed to do so and, thus, failed to establish that the publicity actually inflamed the prejudice of the community to such an extent that a reasonable possibility existed he would not receive a fair trial by an impartial jury.

## CONCLUSION

¶35 In closing, we reiterate the point made in *Moore*:

> Living, as we do, in a society which is continuously inundated with news coverage by the print and broadcast media, it is doubtful that most members of the community will not share some knowledge of, or about, a locally high-profile crime, and the various persons allegedly involved in its commission or in its investigation. Given the inevitable conflict with the media's constitutional right of free speech, the public's constitutional right to know, and the accused's constitutional right to a fair trial, it remains the task of the district court, in such cases, to scrupulously examine the evidence supporting a motion for change of venue to insure that the jurors who will ultimately decide the guilt or innocence of the accused are fair minded and uninfluenced by what they may have seen, heard or read. That conclusion must necessarily be based upon not only the jurors' responses in voir dire, but also on a careful analysis of the quantity and content of the pretrial publicity. Each case is unique and must be decided on its own merits.

*Moore*, 268 Mont. at 54-55, 885 P.2d at 479.

¶36 Here, we are satisfied that the trial judge, in considering the issue, did not act arbitrarily without the employment of conscientious judgment or exceed the bounds of reason. Accordingly, we hold that the District Court did not abuse its discretion when it denied Devlin's motion for change of venue.

19

¶37    Affirmed.

                                        /S/ JAMES C. NELSON

We Concur:

/S/ JIM RICE
/S/ PATRICIA COTTER
/S/ W. WILLIAM LEAPHART
/S/ JOHN WARNER