DA 10-0260

IN THE SUPREME COURT OF THE STATE OF MONTANA

2011 MT 269

STATE OF MONTANA,

  Plaintiff and Appellee,

 v.

MILES CASSIDY KINGMAN,

  Defendant and Appellant.

APPEAL FROM: District Court of the Eighteenth Judicial District,
      In and For the County of Gallatin, Cause No. DC-08-272A
      Honorable Holly Brown, Presiding Judge

COUNSEL OF RECORD:

  For Appellant:

    Joslyn Hunt, Chief Appellate Defender, Shiloh Hernandez (argued),
    Assistant Appellate Defender, Helena, Montana

  For Appellee:

    Steve Bullock, Montana Attorney General, Jonathan M. Krauss (argued),
    Assistant Attorney General, Helena, Montana

    Marty Lambert, Gallatin County Attorney, Todd Whipple, Deputy
    County Attorney, Bozeman, Montana

         Argued: May 2, 2011
        Submitted: May 10, 2011
         Decided: November 1, 2011

Filed:

        _____
              Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 Miles Cassidy Kingman appeals his conviction and sentence rendered in the Eighteenth Judicial District Court, Gallatin County. He raises two issues on appeal:

1. Whether Kingman's motion to change venue should have been granted on the basis of "presumed prejudice" resulting from pretrial publicity.

2. Whether Kingman's right of dignity under Article II, Section 4 of the Montana Constitution was violated by the prosecutor's arguments during sentencing.

We affirm as to both issues.

## BACKGROUND

¶2 Kingman and his friend, Ryan Dibert, went out drinking at a number of Bozeman bars the evening and early morning hours of September 16 and 17, 2008. Their last stop was the Scoop Bar. When they left the Scoop, at around 1:15 a.m., Dibert noticed a motor scooter in the parking lot behind the bar. Dibert jumped on the scooter and began pushing it around. Paul Overby, who also had been at the Scoop drinking that night, and whose friend owned the scooter, confronted Dibert and Kingman. Overby told Dibert and Kingman to leave the scooter alone. Dibert apologized and got off the scooter, and Overby took possession of it.

¶3 The altercation did not end there, however. Overby yelled at Dibert and Kingman and told them to "get the hell out of here." Dibert and Kingman, in turn, proceeded to argue back. The interaction escalated and caught the attention of two passersby, who observed Overby, Dibert, and Kingman shouting, gesturing, and posturing. Kingman eventually grabbed Dibert and they began to walk away, but Overby followed, insulting and threatening them. Overby shoved Kingman several times and hit Kingman once, at

2

which point Kingman turned and punched Overby. One of the bystanders, who testified at trial, heard Overby state: "Is that all you got?" Overby then turned around and started to walk back toward the Scoop, at which point Kingman struck Overby on the side of the head. This appeared to stun Overby. Kingman hit Overby again, which caused Overby to fall to the ground. At that point, Kingman got on top of Overby, who was lying face up, and punched Overby in the face upwards of 15 to 20 times. As one of the bystanders described it, "It was unreal how fast [Kingman] hit [Overby] but he hit him many, many, many times over and over and over again." Overby, meanwhile, just lay there, not responding at all. One of the bystanders yelled at Kingman to stop. Kingman then got off Overby, but Dibert decided to deliver a few "ending blows" and kicked Overby three to five times. Dibert and Kingman then fled the scene.

¶4 Witnesses approached Overby, who was lying on the ground unconscious. His face was unrecognizable. It was covered in blood and one of his eyes was swollen. Blood, teeth, and lacerated flesh were "floating around" in his mouth. Overby appeared to be choking on his own blood, so one of the witnesses rolled Overby on his side to allow the blood to flow out of his mouth. Another witness called 911. Shortly after the responding officer arrived, Overby stopped breathing and the officer was unable to find a pulse. The officer thus commenced chest compressions, and Overby eventually started to breathe again, although he still gasped and gurgled. Medical personnel soon arrived, took over Overby's care, and transported him to the hospital.

¶5 Overby suffered extensive fractures to the vast majority of the bones in his face. Not only were the bones fractured, they had been "pushed back"—meaning that while the

3

bones in our faces are normally "convex," Overby's bones were "flattened or concave." He also had air inside his cranium due to "an open fracture to his brain." His injuries were life-threatening, and one of the doctors who treated Overby testified that he was surprised Overby survived to make it to the emergency room. Due to the complexity of his injuries and the need for a neurosurgeon, which was not available in Bozeman, Overby was flown to Billings. Overby was in the hospital for about a month and had to undergo reconstructive surgeries. He spent another month in rehabilitation.

¶6     In the meantime, after fleeing the scene of the fight, Kingman and Dibert went to Kingman's home, where the two of them "recapped" what had happened. Kingman, who was "really drunk" and "hyped up on adrenaline," realized that he had a gash on his hand which would not stop bleeding. Lacking first aid supplies, he decided to go to the home of his friends Zane and Josette in Belgrade to get his hand stitched up. Kingman later explained at trial that Zane and Josette were "like family" to him. Also, he and Zane were "big fans of UFC boxing and contact sports. . . . [I]f one of us had been in a fight, we'd call each other and brag about it." Thus, before leaving his house, Kingman called Zane and, when Zane did not answer, left the following voicemail message:

> Zane, its Miles. Call me back, dude. I beat this guy to death. I, there's blood all over the house. In fact, both of my legs have splatters of blood on them. And my right hand, it's split so f---ing[1] gnarly bad like thank god I'm drunk cause it would hurt horrible. I can't even wash it out it hurts so bad. But oh my god, dude. Wait till you see my shoes and my pants. I kicked the f--- outta this guy, dude. I just stood over him like f---ing Chuck Liddell getting knocked out. Just one, two, one, one, one,

---

[1] To avoid the gratuitous recitation of expletives, Kingman's repeated and varied usages of the word "fuck" have been abbreviated, as indicated. The message is otherwise quoted verbatim from the audio recording contained in the record.

4

two. Just splatters all over both my pants. I'm never washing them again, dude. Yeah. Two knockouts in one night. I, oh my god dude. This guy's got brain damage. Oh my god. I hit him so f---ing hard. Wait till you see my shoes, my pants, and my shirt, dude. I got splatter to the face. In fact, my face has f---ing got blood splatters from this mother f---er from hitting him so f---ing hard on the ground. Just, oh. Why aren't you answering the phone? My right fist is pretty f---ing broke, dude. I'm pretty sure I can't work. I, I'll work tomorrow, but my right fist is broke, and it hurts horrible. But it's, it's bleeding bad. Anyway, we're gonna send you pictures, dude. My hand. Oh my god, I kicked this mother f---er to death, dude. I felt, oh my god I wish you were there, dude. Oh. Ask Ryan, dude, I just f---ing, it sounded like I was like Rocky punching wet meat on this mother. Everybody, a hundred people around, "Stop hitting him. He's gone." I was just crack, crack, crack, crack. Oh, this mother f---er. Oh. I've nev, oh god it feels so good. So good. Call me back when you get this. Beep, beep, beep. I don't care how late. It's so good. Beep, beep, beep. Oh, I'm gonna call you back right now. Bye.

Zane later turned a recording of this message over to the police.

¶7 Kingman called his friend Katelin and told her he had been in a bar fight and needed a ride out of town. Katelin picked Kingman and Dibert up and drove them to Zane and Josette's home in Belgrade. Katelin noticed that Kingman had blood on his clothes and was acting a "[l]ittle bit hyped up and a little bit paranoid." Kingman was somewhat evasive when Katelin inquired about what had happened. She found his explanations implausible and the whole situation "shocking," "creepy," and "suspicious." After dropping Kingman and Dibert off in Belgrade, Katelin contacted the police.

¶8 Kingman was arrested later that morning (September 17, 2008), and the State charged him October 3 with attempted deliberate homicide. The State also charged Dibert with attempted deliberate homicide. The District Court initially set Kingman's trial for late July 2009; however, pursuant to a defense motion, the court continued the trial to November 12, 2009. A three-day jury trial commenced on that date.

5

¶9 In the interim, local media—newspaper, television, and radio—reported on the altercation behind the Scoop and subsequent developments related to the charges filed against Kingman and Dibert. Most of this coverage occurred during the first three weeks following the incident, though there was some sporadic coverage in late 2008 and the first half of 2009 as well. In addition to the news media publicity regarding the case, various fundraising activities occurred in the Gallatin County area on Overby's behalf. His friends placed donation jars in several local businesses, set up a fund at Big Sky Western Bank, and organized a benefit (referred to as "Pillage in the Village '08") in Big Sky, Montana, which reportedly raised $5,800. According to one of the news stories, the majority of Overby's medical costs were covered by insurance, but the moneys raised by his friends helped with living expenses during his recovery.

¶10 On June 29, 2009, Kingman's defense filed a motion for change of venue "due to the inflammatory nature of the publicity, the repeated statements in the media which presume the guilt of Mr. Kingman, and the resulting prejudice in the community such that it is reasonable to believe he will not receive a fair and impartial trial." As grounds for the motion, Kingman cited § 46-13-203, MCA (providing for change of the place of trial because of prejudice), the Sixth and Fourteenth Amendments to the United States Constitution, and Article II, Sections 17 and 24 of the Montana Constitution.

¶11 Following a status conference, the District Court ordered the Clerk of the District Court to draw a jury panel of 150 jurors. Both Kingman and the prosecution agreed that the 150 individuals drawn were a representative sample of potential jurors in Gallatin County. The prosecution and Kingman stipulated to a jury questionnaire, which was

mailed to prospective jurors. Included in the questionnaire were several questions related to Kingman's motion to change venue: whether the prospective juror had seen, read, or heard anything about the case; from what sources and how many times the juror had seen, read, or heard about the case; what the juror thought he or she knew about the case; and, as a result of what he or she had seen, read, heard, or discussed about the case, whether the juror had "formed an opinion that would affect your ability to serve as a juror." The District Court attached a cover letter directing the prospective jurors, among other things, not to make any investigation or inquiries into the case on their own and not to watch or read any news accounts relating to the case. All 150 prospective jurors returned their questionnaires. On the question whether the juror had seen, read, or heard anything about the case, 96 marked "yes," 47 marked "no," 3 left the question blank, and 4 indicated they were unsure whether they knew of the case. As to the question whether the juror had "formed an opinion that would affect your ability to serve as a juror," 27 marked "yes," 108 marked "no," and 15 left the question blank.

¶12 The District Court held a hearing on Kingman's motion. The court and the parties agreed that the court would decide the motion based on the responses received to the juror questionnaires and on the exhibits submitted by Kingman (recordings of KBZK television broadcasts, copies of newspaper articles, census information, and circulation statistics for the *Bozeman Daily Chronicle*). Kingman and the prosecution presented arguments and thereafter filed proposed findings of fact and conclusions of law. The District Court then issued its decision, denying the motion. The court concluded that the pretrial publicity had not been inflammatory and that Kingman had failed to show that the

7

prospective jurors could not set aside what they had heard or read in the media and decide his guilt impartially and based solely on the evidence admitted at trial.

¶13     The case proceeded to trial.  Kingman argued to the jury that he had attempted to retreat from the altercation with Overby, but when Overby followed and shoved him several times, Kingman reacted in self-defense.  Ultimately, the jury acquitted him of attempted deliberate homicide but convicted him of aggravated assault, a lesser included offense.  At the sentencing hearing, the prosecutor recommended the maximum sentence of 20 years imprisonment.  In so doing, the prosecutor argued that what Kingman did on September 17, 2008, was "inhuman," and the prosecutor likened Kingman to an "animal" that needed to be "caged."  In response, defense counsel argued that this was an offensive and inappropriate argument and that all persons, even those convicted of crimes, are still afforded "at least some measure of human dignity."

¶14     The District Court sentenced Kingman to the Montana State Prison for 20 years, with none of that time suspended.  The court also imposed restitution in the amount of $183,115.43 and ordered Kingman to register as a violent offender.  Kingman now appeals.  Additional facts are set forth below where relevant.

## DISCUSSION

¶15     *Issue 1.  Whether Kingman's motion to change venue should have been granted on the basis of "presumed prejudice" resulting from pretrial publicity.*

¶16     As noted, Kingman asserts his rights under the Sixth and Fourteenth Amendments to the United States Constitution and under Article II, Sections 17 and 24 of the Montana Constitution.  Although he presents two separate analyses in this regard—one under the

8

federal Constitution and the other under the Montana Constitution—we conclude, for the reasons which follow, that the framework for analyzing change-of-venue motions is the same under both documents.[2] In reaching this conclusion, we reconcile our approach with that followed by the federal courts so as to facilitate consistency in the analysis.

## Foundational Change-of-Venue Principles

¶17 A criminal charge brought under Montana law must be filed in the county where the offense was committed, and the place of trial must be in that same county, unless otherwise provided by law. Sections 46-3-110(1), -111(1), MCA; *see also* Mont. Const. art. II, § 24 (the accused has the right to be tried by a jury of the county or district in which the offense is alleged to have been committed). Analogously, a federal prosecution occurs in the state and district where the crime was committed. *Skilling v. U.S.*, ___ U.S. ___, 130 S. Ct. 2896, 2913 (2010) (citing U.S. Const. art. III, § 2, cl. 3, and amend. VI).

¶18 At the same time, however, Article II, Sections 17 and 24 secure to the defendant the right to a "fair trial" by an "impartial jury." *See State v. Allen*, 2010 MT 214, ¶ 25, 357 Mont. 495, 241 P.3d 1045; *In re T.J.F.*, 2011 MT 28, ¶ 26, 359 Mont. 213, 248 P.3d 804; *State v. Dryman*, 127 Mont. 579, 588, 269 P.2d 796, 800 (1954). The Sixth and Fourteenth Amendments likewise guarantee "a fair trial by a panel of impartial, indifferent jurors." *Hayes v. Ayers*, 632 F.3d 500, 507 (9th Cir. 2011) (internal quotation

---

[2] Of course, "we may interpret a provision of the Montana Constitution to afford greater protection than that afforded by its federal counterpart." *State v. Clark*, 1998 MT 221, ¶ 20, 290 Mont. 479, 964 P.2d 766. Hence, there may be circumstances in which a change of venue is mandated by Montana law although the same is not required by federal law. But the present case is not such a case.

marks omitted). Accordingly, if there exists in the county in which the prosecution is pending "such prejudice that a fair trial cannot be had in the county," then the court is required (upon motion by the defense or the prosecution) to transfer the cause to another county, direct that a jury be selected from another county, or take any other action designed to ensure that a fair trial may be had. Section 46-13-203, MCA. Similarly, in the federal context, the court must transfer the proceeding to another district if "so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there." Fed. R. Crim. P. 21(a); *see also Skilling*, 130 S. Ct. at 2913 ("The Constitution's place-of-trial prescriptions . . . do not impede transfer of the proceeding to a different district at the defendant's request if extraordinary local prejudice will prevent a fair trial—a 'basic requirement of due process.' ").

¶19    As these rules make clear, the prerequisite for obtaining a change of venue on the ground of "prejudice" is that there is such prejudice as will prevent a fair and impartial trial in the current venue. There are various forms the prejudice might take—such as a community uproar or too many people in the community with close ties to the victim— but the ground most commonly advanced for a "fair trial" change of venue is that adverse pretrial publicity precludes selection of an unbiased jury. Wayne R. LaFave et al., *Criminal Procedure* vol. 4, § 16.3(b), 806 (3d ed., Thomson/West 2007). In this regard, Kingman points out that prejudice may be "presumed" in certain circumstances. Indeed, as explained below, a motion for change of venue may be founded on presumed prejudice or on actual prejudice, and different standards apply depending on which sort of prejudice

is claimed. This distinction is recognized explicitly in federal caselaw but, until now, has been essentially implicit in our own cases.

## Presumed Prejudice versus Actual Prejudice under Federal Law

¶20 " 'The theory of our [trial] system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print.' " *Skilling*, 130 S. Ct. at 2913 (brackets in *Skilling*) (quoting *Patterson v. Colorado*, 205 U.S. 454, 462, 27 S. Ct. 556, 558 (1907)). A defendant can establish that jurors drawn from the community cannot judge his case impartially and unswayed by outside influence, thus necessitating a change of venue, by two methods: he can demonstrate that the jury pool is *actually* prejudiced against him, or he can demonstrate that juror prejudice should be *presumed* from prejudice in the community and pretrial publicity. *See Murphy v. Florida*, 421 U.S. 794, 803, 95 S. Ct. 2031, 2038 (1975); *U.S. v. Higgs*, 353 F.3d 281, 307-08 (4th Cir. 2003); *Foley v. Parker*, 488 F.3d 377, 387 (6th Cir. 2007); *U.S. v. Blom*, 242 F.3d 799, 803 (8th Cir. 2001); *Gallego v. McDaniel*, 124 F.3d 1065, 1070 (9th Cir. 1997); *House v. Hatch*, 527 F.3d 1010, 1023-24 (10th Cir. 2008); *see also e.g. Skilling*, 130 S. Ct. at 2913-25 (analyzing the defendant's claims of presumed prejudice and actual prejudice).

¶21 "[P]rejudice is presumed where 'pretrial publicity is so pervasive and prejudicial that we cannot expect to find an unbiased jury pool in the community.' " *House*, 527 F.3d at 1023 (quoting *Goss v. Nelson*, 439 F.3d 621, 628 (10th Cir. 2006)); *see also U.S. v. Angiulo*, 897 F.2d 1169, 1181 (1st Cir. 1990) (prejudicial, inflammatory publicity about the case has so saturated the community as to render it virtually impossible to

11

obtain an impartial jury); *U.S. v. Campa*, 459 F.3d 1121, 1150 (11th Cir. 2006) (en banc) (prejudicial publicity has saturated the community, and there is a reasonable certainty that the prejudice prevents the defendant from obtaining a fair trial). To justify a presumption of prejudice under this standard, the publicity must be both extensive *and* sensational in nature. *Angiulo*, 897 F.2d at 1181.

¶22 The seminal case on presumed prejudice is *Rideau v. Louisiana*, 373 U.S. 723, 83 S. Ct. 1417 (1963). There, the defendant's videotaped confession to authorities was repeatedly broadcast to the relatively small community over the local television station, resulting in a "kangaroo court" which derailed due process and quashed any hope of a fair trial in that locale. *Rideau*, 373 U.S. at 726, 83 S. Ct. at 1419. The Supreme Court held that "the spectacle of Rideau personally confessing in detail to the crimes with which he was later to be charged," to the tens of thousands of people who saw and heard it, "in a very real sense *was* Rideau's trial—at which he pleaded guilty to murder. Any subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality." *Rideau*, 373 U.S. at 726, 83 S. Ct. at 1419 (emphasis in original). The Supreme Court reached this conclusion "without pausing to examine a particularized transcript of the *voir dire* examination of the members of the jury." *Rideau*, 373 U.S. at 727, 83 S. Ct. at 1419-20. Prejudice was presumed.

¶23 The Supreme Court also presumed prejudice in *Sheppard v. Maxwell*, 384 U.S. 333, 335, 86 S. Ct. 1507, 1508 (1966), due to "the massive, pervasive and prejudicial publicity" that occurred before and during Sheppard's trial on the charge of murdering his wife. Not only was the case made "notorious" by the "virulent publicity" about

Sheppard and the murder, but numerous pictures of the jurors, with their addresses, appeared in the newspapers, exposing them to expressions of opinion from both cranks and friends. Moreover, "bedlam" and a "carnival atmosphere" reigned at the courthouse during trial, with newsmen taking over practically the entire courtroom and hounding most of the participants in the trial, especially Sheppard. *Sheppard*, 384 U.S. at 353-55, 358, 86 S. Ct. at 1517-18, 1520. Due to the "inherently prejudicial publicity" which saturated the community and the "disruptive influences" in the courtroom, the Supreme Court concluded that Sheppard's trial had been "inherently" lacking in due process. *Sheppard*, 384 U.S. at 351-52, 363, 86 S. Ct. at 1516-17, 1522-23; *see also e.g. Estes v. Texas*, 381 U.S. 532, 536, 85 S. Ct. 1628, 1629 (1965) (presuming prejudice where the media's overzealous reporting efforts led to "considerable disruption" of the proceedings and denied the "judicial serenity and calm to which [the defendant] was entitled").

¶24 The rationale underlying "presumed prejudice" is that "we simply cannot rely on jurors' claims that they can be impartial," and we therefore declare the publicity to be "prejudicial as a matter of law." *U.S. v. McVeigh*, 153 F.3d 1166, 1182 (10th Cir. 1998) (internal quotation marks omitted); *see also Patton v. Yount*, 467 U.S. 1025, 1031, 104 S. Ct. 2885, 2889 (1984) ("[A]dverse pretrial publicity can create such a presumption of prejudice in a community that the jurors' claims that they can be impartial should not be believed."); *Hayes*, 632 F.3d at 511 ("We may give little weight to a prospective juror's assurances of impartiality where the general atmosphere in the community or courtroom is sufficiently inflammatory." (citations and internal quotation marks omitted)); *U.S. v. Abello-Silva*, 948 F.2d 1168, 1176-77 (10th Cir. 1991) ("In rare cases, the community is

so predisposed that prejudice can be presumed, and venue must be transferred as a matter of law."); LaFave et al., *Criminal Procedure* vol. 6, § 23.2(a), 264 ("[P]rejudicial publicity may be so inflammatory and so pervasive that the voir dire simply cannot be trusted to fully reveal the likely prejudice among prospective jurors."). The principle of presumed prejudice is "rarely applicable" and is reserved for "extreme situations." *See Hayes*, 632 F.3d at 508; *Campa*, 459 F.3d at 1143; *accord Skilling*, 130 S. Ct. at 2915 ("A presumption of prejudice, our decisions indicate, attends only the extreme case."). The bar facing the defendant seeking to prove presumed prejudice is, correspondingly, "extremely high." *McVeigh*, 153 F.3d at 1182. Thus, it has been said that to establish presumptive prejudice, the defendant must show that "an irrepressibly hostile attitude pervade[s] the community" and that the publicity "dictates the community's opinion as to guilt or innocence." *Abello-Silva*, 948 F.2d at 1176. It likewise has been said that prejudice cannot be presumed unless the trial atmosphere has been "utterly corrupted by press coverage." *Campa*, 459 F.3d at 1144 (internal quotation marks omitted). Circumstances amounting to "a circus atmosphere or lynch mob mentality" would justify a presumption of prejudice. *Stafford v. Saffle*, 34 F.3d 1557, 1566 (10th Cir. 1994). So would proceedings that are "entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of a mob." *Murphy*, 421 U.S. at 799, 95 S. Ct. at 2036. The reviewing court "must find that the publicity in essence displaced the judicial process, thereby denying the defendant his constitutional right to a fair trial." *McVeigh*, 153 F.3d at 1181.

14

¶25 Where circumstances are not so extreme as to warrant a presumption of prejudice, the defendant may claim "actual prejudice." Actual prejudice exists when voir dire reveals that the jury pool harbors actual partiality or hostility against the defendant. *Foley*, 488 F.3d at 387; *Hayes*, 632 F.3d at 508; *see also House*, 527 F.3d at 1024 (actual prejudice manifests at jury selection when voir dire reveals that the effect of pretrial publicity is so substantial as to taint the entire jury pool). The voir dire testimony and the record of publicity must reveal "the kind of wave of public passion" that would make a fair trial unlikely by a jury empaneled from that community. *House*, 527 F.3d at 1024 (internal quotation marks omitted). The relevant question is whether prospective jurors' responses reflect "such fixed opinions that they could not judge impartially the guilt of the defendant." *Patton*, 467 U.S. at 1035, 104 S. Ct. at 2891. "Impartiality does not mean jurors are totally ignorant of the case. Indeed, it is difficult to imagine how an intelligent venireman could be completely uninformed of significant events in his community. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Abello-Silva*, 948 F.2d at 1178 (internal quotation marks omitted); *accord Foley*, 488 F.3d at 387.

**Montana Law**

¶26 Our own cases have resolved the question of prejudice in a similar manner.

¶27 In *State ex rel. Coburn v. Bennett*, 202 Mont. 20, 655 P.2d 502 (1982), we held that a change of venue should have been granted based on "inherent prejudice." Coburn was charged with aggravated kidnapping and sexual intercourse without consent. Bail initially was set at $100,000, but the district court reduced it to $15,000, which Coburn

15

posted, after which he was released. This prompted outrage in the community. Angry citizens marched on the courthouse; public meetings were held; organizations were established devoted to removing the district court judge and to dealing with persons who commit sex crimes; vandalism occurred; and threats were made against Coburn. The local newspaper reported on these events, detailing much of the evidence gathered by investigators and tying that evidence to the defendant. In addition, some articles gave quoted statements by the sheriff, the county attorney, and a deputy county attorney that were prejudicial to the defendant. *Coburn*, 202 Mont. at 22-30, 655 P.2d at 503-07. On several occasions, the newspaper went beyond an objective dissemination of information. "Instead of calming an enraged community and providing an atmosphere in which the processes of justice could go forward without bias, the [newspaper] inflamed an already angry populace." *Coburn*, 202 Mont. at 30-31, 655 P.2d at 507.

¶28 When the district court denied his motion for change of venue, Coburn filed a petition for a writ of supervisory control. Appearing on behalf of the respondent judge, the prosecutor argued that voir dire is the proper time to determine whether prejudice against Coburn still existed. We disagreed. Citing federal caselaw, we explained:

> While the determination of whether widespread prejudice prohibits selection of an impartial jury is usually made during voir dire, each case must turn on its special facts. It is widely recognized in the federal courts that while voir dire is usually essential to resolution of a venue question, a motion for change of venue may be decided prior to voir dire if the circumstances of the case indicate inherent prejudice. Effective and economic judicial administration is not well served by calling an inordinate and unwieldy number of veniremen to see if an unbiased jury might be obtained, especially when it is already apparent that a substantial chance of intolerable prejudice exists.

16

*Coburn*, 202 Mont. at 32-33, 655 P.2d at 508 (citations and internal quotation marks omitted); *accord State v. Paisley*, 204 Mont. 191, 194-95, 663 P.2d 322, 324 (1983) (finding voir dire unnecessary given the extensive and inflammatory media coverage of the charges against the defendant). We noted, in addition, that "[b]eyond the question of judicial economy lie the problems inherent in the voir dire system itself. . . . The courtroom can exert a unique pressure upon a juror or prospective juror which may render that person's degree of impartiality indiscernible even to himself." *Coburn*, 202 Mont. at 33, 655 P.2d at 508. In this connection, we cited another case, *State v. Spotted Hawk*, 22 Mont. 33, 55 P. 1026 (1899), in which this Court also presumed prejudice.

¶29    In *Spotted Hawk*, the defendant (Spotted Hawk) was charged in Custer County with the murder of a man named Hoover. Spotted Hawk's motion to change the place of trial was denied, after which he was tried, convicted, and sentenced to be hanged. On appeal, we reversed and ordered a new trial. We did so in light of the following facts and circumstances identified by Spotted Hawk: people in the county believed the Cheyenne Indians had killed Hoover; thus, roughly 200 armed cowboys and ranchmen had gathered near the Cheyenne Indian Agency intending either to force the murderers' surrender or to go on the Reservation and "exterminate the tribe"; these men were only persuaded from attacking the Indians by the civil authorities of the county; at the time of Hoover's burial, a large number of men took an oath that they would be present at the trial of the Indians charged with Hoover's murder, and, if they were acquitted, the men "would take the law in their own hands, and hang the Indians before they left the courthouse yard"; the Custer County newspapers denounced the Indians and unduly excited the inhabitants with

17

"extravagant and inflammatory" publications; at the time Hoover's body was found, and thereafter, there was unfriendly talk against Spotted Hawk, and the inhabitants of the county held him in utter contempt; bitterness against the Indians extended to all parts of the county and existed at the time of the trial; and the military authorities sent several companies of soldiers to prevent an outbreak of hostilities between the whites and Indians over Hoover's murder. *Spotted Hawk*, 22 Mont. at 47-48, 53-55, 55 P. at 1029, 1031-32. In these circumstances, we presumed that such prejudice existed as to preclude a fair trial in Custer County. *Spotted Hawk*, 22 Mont. at 56, 55 P. at 1032. We explained that when the public sentiment is in "a blaze of excitement and passion" against one of the parties to the action, the pressure of this public sentiment could make itself felt during the trial and could influence or bias the jurors, the witnesses, and the officers of court, even if only unconsciously, despite their honest intention of doing their duty. *Spotted Hawk*, 22 Mont. at 56, 55 P. at 1032 (internal quotation marks omitted).

¶30   We also presumed that an unbiased jury could not be selected in *State v. Dryman*, 127 Mont. 579, 269 P.2d 796 (1954). There, the defendant (Dryman), then 19 years of age, without benefit of counsel, initially entered a plea of guilty to the charge of murder and was sentenced to be "hanged by the neck until dead." Following his first appeal to this Court, Dryman was permitted to withdraw his guilty plea. He then filed a motion to change venue on the ground that the people of Toole County were so prejudiced against him that it would be impossible to receive a fair trial by an unbiased jury in the county. The district court denied the motion, but on Dryman's second appeal, we reversed. We noted that certain publications by the local newspaper had "tended to fan the flame of

18

high feeling against the defendant rather than to quench it" and had also "tended to give its readers the impression that the law and its procedures were deliberately, by trickery, delay and favoritism, defeating justice." *Dryman*, 127 Mont. at 589, 269 P.2d at 801. Most notably, the paper had circulated a flyer captioned "Extra" at the top, containing a picture of Dryman with the word "Killer" over his picture and detailing the story of the crime and what took place in the courtroom when Dryman was first sentenced to death following his plea of guilty. The article described Dryman as a "cold blooded killer." It noted that Dryman had the rights to counsel, to a jury trial, and to a change of venue, but that he had declined to exercise these rights. The author opined that Dryman "must have pre-judged in his own heart the black guilt in which he perpetrated the most dastardly deed in the history of Toole County. Either that, or as it appeared he was so steeped in criminal tendencies that nothing could appeal to his warped and stony mind." Dryman's prior conviction for robbing a liquor store was cited. *Dryman*, 127 Mont. at 581-83, 269 P.2d at 797-98. In addition to the press coverage, we noted that pending his first appeal to this Court, the trial judge, the local sheriff, and the State Prison Commission had all agreed that Dryman should be housed at the state penitentiary in Deer Lodge, rather than the Toole County jail, because "there was such a feeling and prejudice in Toole County that defendant might have been lynched if he had been kept in Toole County." *Dryman*, 127 Mont. at 588, 269 P.2d at 800. Moreover, at the hearing on the motion for change of venue, the State's witnesses conceded that the feeling in the community toward Dryman was the same then as it had been immediately after the murder and Dryman's guilty plea. The "widespread and deep-seated opinion" was that Dryman was guilty and should be

19

hanged. *Dryman*, 127 Mont. at 586-87, 590, 269 P.2d at 799-800, 801. We noted that "it seems natural that such opinion should exist in Toole County," given Dryman's guilty plea and the inflammatory press coverage. But the existence of such opinion led us to hold that he was entitled to have his new trial moved "from Toole County to some other county not adjacent thereto." *Dryman*, 127 Mont. at 590, 269 P.2d at 801.

¶31 As can be seen from these examples, this Court will presume prejudice—similar to the approach of the federal courts—in extreme situations where there are such pervasive and strong passions of anger, hatred, indignation, revulsion, and upset in the community that we simply cannot rely on jurors' claims that they can be impartial. *Cf. State v. Abe*, 1998 MT 206, ¶¶ 36-41, 290 Mont. 393, 965 P.2d 882 (concluding that the publicity, even if inflammatory, was not so widespread as to generate a general belief about the defendant's guilt throughout the jury pool). Apart from such exceptional cases, however, we have required the defendant to show that jurors selected from the community actually could not set aside what they have heard or read in the media and decide the defendant's guilt impartially and based solely on the evidence admitted at trial. *State v. Devlin*, 2009 MT 18, ¶ 32, 349 Mont. 67, 201 P.3d 791. Voir dire, we have noted, is a primary method of demonstrating that potential jurors have been so affected by pretrial publicity that they would be unable to render a fair and impartial verdict. *Devlin*, ¶ 30. Cases reflecting this requirement include *Devlin*, ¶¶ 30-34; *State v. Bar-Jonah*, 2004 MT 344, ¶¶ 83-89, 324 Mont. 278, 102 P.3d 1229; *State v. Hill*, 2000 MT 308, ¶¶ 54-55, 302 Mont. 415, 14 P.3d 1237; *State v. Fuhrmann*, 278 Mont. 396, 408-10, 925 P.2d 1162, 1170-71 (1996); *State v. Moore*, 268 Mont. 20, 52-55, 885 P.2d 457, 477-79 (1994); *State v. Miller*, 231 Mont.

20

497, 505-07, 757 P.2d 1275, 1280-81 (1988); *State v. Ritchson*, 199 Mont. 51, 55, 647 P.2d 830, 832 (1982); *State v. Armstrong*, 189 Mont. 407, 422-23, 616 P.2d 341, 350 (1980); and *State v. Williams*, 185 Mont. 140, 145-46, 604 P.2d 1224, 1227-28 (1979).

**Framework and Standard of Review**

¶32 In light of the foregoing discussion of federal and Montana cases, we now clarify the standards and procedures for analyzing the two different types of prejudice. As the basis of a motion for change of venue, the defendant may allege presumed prejudice, actual prejudice, or both. Where presumed prejudice is alleged—meaning that the court is being asked to presume that jurors selected from the community cannot be impartial— the bar is extremely high. The defendant must demonstrate that an irrepressibly hostile attitude pervades the jury pool or that the complained-of publicity has effectively displaced the judicial process and dictated the community's opinion as to the defendant's guilt or innocence. Presumed prejudice, necessitating a change of venue, will be found only in situations analogous to *Rideau*, *Sheppard*, *Spotted Hawk*, *Dryman*, and *Coburn*— i.e., circumstances amounting to "a circus atmosphere or lynch mob mentality." Where such extreme circumstances are not present, and actual prejudice is alleged, the defendant must show through voir dire or other means that the jury pool harbors actual partiality or hostility against the defendant that cannot be laid aside. The same standards apply if the prosecutor moves for a change of venue under § 46-13-203, MCA.

¶33 Furthermore, because media coverage may occur throughout the pretrial period and the trial itself, and because new publicity may generate new concerns about the defendant's ability to receive a fair and impartial trial, a motion for change of venue may

be made or renewed at any point during the pretrial period, voir dire, or the trial, as circumstances dictate. We have adopted a similar approach with respect to speedy trial motions, explaining that such motions must be evaluated based on the facts existing at the time the motion is decided and that if further delay or changed circumstances justify reconsideration of the issue, then a renewed motion for a speedy trial must be made. *State v. Hendershot*, 2009 MT 292, ¶¶ 30-32, 352 Mont. 271, 216 P.3d 754. Likewise, if subsequent events raise new concerns regarding juror impartiality or the ability to receive a fair trial in the current venue, then a renewed motion for change of venue or a post-trial motion for a new trial may be filed. Correspondingly, on appeal, a party will not be heard to complain that a trial court was wrong for refusing to grant a change of venue based on publicity or concerns that arose *after* the request was made. *See e.g. State v. Brandon*, 264 Mont. 231, 247, 870 P.2d 734, 743 (1994); *cf. Hendershot*, ¶ 32.

¶34 Lastly, it is necessary to address our standard of review. Kingman notes that since territorial days, this Court has reviewed a trial court's change-of-venue ruling for abuse of discretion. *See e.g. Territory v. Corbett*, 3 Mont. 50, 57 (1877); *Paisley*, 204 Mont. at 194, 663 P.2d at 324; *Devlin*, ¶ 15. Kingman asks us to revise this standard where, as here, the defendant alleges "presumed prejudice." He argues in this regard, first, that the standard of review under federal law is de novo where the motion is based on presumed prejudice and, second, that we should adopt the same standard for purposes of Montana law because a motion to change venue on account of prejudicial publicity is rooted in the defendant's constitutional rights to due process and a fair trial by an impartial jury.

22

¶35 We decline to adopt this approach. First, it is true that "[t]his Court cannot adopt a lower standard to protect any right in the United States Constitution than the United States Supreme Court has recognized." *State v. Lone Elk*, 2005 MT 56, ¶ 20, 326 Mont. 214, 108 P.3d 500, *overruled on other grounds*, *State v. Brinson*, 2009 MT 200, ¶ 9, 351 Mont. 136, 210 P.3d 164; *accord State v. Bentley*, 156 Mont. 129, 134, 477 P.2d 345, 347 (1970) ("Montana cannot guarantee less protection for a citizen under its laws than is demanded by the Constitution of the United States."). Yet, contrary to Kingman's implication, there is no clearly established federal law—least of all by the Supreme Court—holding that "de novo" review applies to claims of presumed prejudice.

¶36 In support of this proposition, Kingman cites *McVeigh*, 153 F.3d at 1179, where the Tenth Circuit stated, on one hand, that it would undertake de novo review of whether the complained-of publicity and the circumstances surrounding that publicity were "of such a nature as to render impartiality impossible" (presumed prejudice), but, on the other hand, that it would review for abuse of discretion "whether the seated jury could remain impartial in the face of negative pretrial publicity" (actual prejudice). We note that the Fifth Circuit stated the same dual standards in *U.S. v. Skilling*, 554 F.3d 529, 557-58 (5th Cir. 2009) ("We review de novo whether presumed prejudice tainted a trial . . . . In reviewing actual prejudice, however, we afford greater deference to the district court . . . ."), *vacated in part on other grounds*, 130 S. Ct. 2896.

¶37 Notably, neither *McVeigh* nor the Fifth Circuit's *Skilling* opinion provides a satisfactory explanation for why a trial court is accorded greater deference in evaluating actual prejudice than it is accorded in evaluating presumed prejudice. More importantly,

23

however, it appears that aside from these two cases, the federal courts of appeals uniformly recite an "abuse of discretion" standard of review for both presumed prejudice and actual prejudice. *See U.S. v. Misla-Aldarondo*, 478 F.3d 52, 58-59 (1st Cir. 2007); *U.S. v. Sabhnani*, 599 F.3d 215, 232-34 (2d Cir. 2010); *U.S. v. Inigo*, 925 F.2d 641, 654-55 (3d Cir. 1991); *U.S. v. Higgs*, 353 F.3d 281, 307-09 (4th Cir. 2003); *U.S. v. Jamieson*, 427 F.3d 394, 412-13 (6th Cir. 2005); *U.S. v. Nettles*, 476 F.3d 508, 513-15 (7th Cir. 2007); *U.S. v. Rodriguez*, 581 F.3d 775, 784-86 (8th Cir. 2009); *U.S. v. Collins*, 109 F.3d 1413, 1416 (9th Cir. 1997); *U.S. v. Langford*, 647 F.3d 1309, 1319, 1332-34 (11th Cir. 2011). It should also be noted that the Tenth Circuit's and the Fifth Circuit's own precedents are inconsistent in requiring "de novo" review. *Compare McVeigh*, 153 F.3d at 1179, *and Skilling*, 554 F.3d at 557-58, *with U.S. v. Abello-Silva*, 948 F.2d 1168, 1176 (10th Cir. 1991) (acknowledging the two types of prejudice and then stating that "[s]ince the decision to transfer venue is within the trial court's discretion, we review for an abuse of discretion"), *and U.S. v. Asibor*, 109 F.3d 1023, 1037 (5th Cir. 1997) ("We review all questions concerning venue under the abuse of discretion standard. The trial court is entitled to broad discretion in ruling on motions to transfer venue, and its decision will be upheld absent an abuse of discretion.").

¶38　Second, it is also true that the mechanism allowing the defendant to obtain a change of venue is founded primarily on the principle that a defendant is constitutionally entitled to a fair trial by an impartial jury. And it is well established that we review questions of constitutional law de novo. *State v. Stock*, 2011 MT 131, ¶ 16, 361 Mont. 1, 256 P.3d 899; *State v. Couture*, 2010 MT 201, ¶ 47, 357 Mont. 398, 240 P.3d 987. "A

24

district court has no discretion in the correct interpretation of the Constitution." *State v. Norquay*, 2011 MT 34, ¶ 13, 359 Mont. 257, 248 P.3d 817. Hence, the question whether the defendant ultimately received a fair trial in accordance with due process is still a question over which we exercise plenary review.

¶39 However, in determining the more specific question whether, in light of extant circumstances, such prejudice exists as to necessitate a change of venue, the trial court must be afforded broad deference. Indeed, the nature of this determination simply does not lend itself to de novo review on the cold record. As the Supreme Court has pointed out, primary reliance on the judgment of the trial court makes especially good sense when pretrial publicity is at issue, because the judge sits in the locale where the publicity is said to have had its effect and may base her evaluation on her own perception of the depth and extent of news stories that might influence a juror. *Skilling*, 130 S. Ct. at 2918. The judge is also, we note, more intimately familiar with the defendant's reputation, what the local reaction to the crime has been, and the overall community sentiment. Conversely, appellate courts making after-the-fact assessments of the media's impact on jurors "lack the on-the-spot comprehension of the situation possessed by trial judges." *Skilling*, 130 S. Ct. at 2918. Not only is this true with respect to claims of presumed prejudice, it is even more compelling in the context of alleged actual prejudice.

> Reviewing courts are properly resistant to second-guessing the trial judge's estimation of a juror's impartiality, for that judge's appraisal is ordinarily influenced by a host of factors impossible to capture fully in the record—among them, the prospective juror's inflection, sincerity, demeanor, candor, body language, and apprehension of duty. In contrast to the cold transcript received by the appellate court, the in-the-moment *voir*

*dire* affords the trial court a more intimate and immediate basis for assessing a venire member's fitness for jury service.

*Skilling*, 130 S. Ct. at 2918 (citation omitted).

¶40     In short, the trial judge is uniquely positioned to assess whether a change of venue is called for due to prejudice in the community.  For this reason, and because there is no clearly established law under the United States Constitution mandating "de novo" review of "presumed prejudice" claims, we will continue to review for abuse of discretion a trial court's ruling on a motion for change of venue.  We reiterate, though, that "in exercising its discretion, the court is bound to uphold the defendant's constitutional right to a trial by an impartial jury." *Devlin*, ¶ 15.

### Analysis of Kingman's Claim

¶41     Kingman filed his motion for change of venue during the pretrial period, based on media coverage and community sentiment that existed as of late June 2009.  The District Court approved the jury questionnaire in August, held a hearing in September, and rendered its decision on October 7, five weeks before trial commenced.  By stipulation of the parties, the court's ruling was based on the responses to the questionnaires and on the exhibits submitted by Kingman (recordings of KBZK television broadcasts, copies of newspaper articles, census information, and circulation statistics for the *Bozeman Daily Chronicle*).  Kingman did not renew his motion for change of venue at the conclusion of voir dire or during trial.  He states on appeal that his motion is based on presumed prejudice, not actual prejudice.

¶42　The Supreme Court's decision in *Skilling* and our decisions in *Spotted Hawk*, *Dryman*, and *Coburn* indicate that a variety of factors may bear on the question whether prejudicial, inflammatory publicity about the case has so saturated the community as to warrant a presumption that an impartial jury cannot be drawn therefrom. First, the size and characteristics of the community in which the crime occurred are clearly relevant. The larger and more diverse the jury pool, the more likely that 12 impartial individuals can be empaneled from that pool. *See Skilling*, 130 S. Ct. at 2915. Second, community sentiment is relevant. The more demonstrably enraged or inflamed the community is, the less likely it will be to find jurors who can render a decision free from bias. *See Spotted Hawk*, 22 Mont. at 53-55, 55 P. at 1031-32; *Dryman*, 127 Mont. at 586-89, 269 P.2d at 799-801; *Coburn*, 202 Mont. at 30, 655 P.2d at 507. A third factor is the nature of the publicity—whether it is of the type that readers or viewers could not reasonably be expected to shut from sight, and whether it invites prejudgment of the defendant's culpability. *See Skilling*, 130 S. Ct. at 2916; *Dryman*, 127 Mont. at 589, 269 P.2d at 801; *Coburn*, 202 Mont. at 30-31, 655 P.2d at 507; *see also Devlin*, ¶ 24 (" 'Inflammatory' publicity is publicity which, by its nature, has the tendency to stir up in the community pervasive and strong passions of anger, hatred, indignation, revulsion, and upset such that there are reasonable grounds to believe that jurors chosen from this community could not determine the defendant's guilt or innocence in a fair and unbiased manner and based solely upon the evidence admitted at trial."). Another relevant factor is the amount of time that elapsed between the crime and the defendant's trial, and whether community passions diminished during that period. *See Skilling*, 130 S. Ct. at 2916; *Dryman*, 127

27

Mont. at 586-87, 269 P.2d at 799-800. Lastly, and of "prime significance" when evaluating post-verdict whether prejudice existed, is the question whether jurors' actions ultimately ran counter to a presumption of prejudice—e.g., if they acquitted the defendant of some of the charges. *See Skilling*, 130 S. Ct. at 2916 (Skilling's jury acquitted him of nine insider-trading counts); *U.S. v. Arzola-Amaya*, 867 F.2d 1504, 1514 (5th Cir. 1989) ("The jury's ability to discern a failure of proof of guilt of some of the alleged crimes indicates a fair minded consideration of the issues and reinforces our belief and conclusion that the media coverage did not lead to the deprivation of [the defendants'] right to an impartial trial."). This list identifies some, but not necessarily all, of the factors pertinent to a "presumed prejudice" analysis.

¶43 In the present case, the District Court determined that the number of eligible jurors in Gallatin County was 63,000, from which a representative sample of 150 was drawn. The court observed that Kingman had been charged with a "serious" offense, but that homicide charges "sadly are not a rare occurrence in Gallatin County recently." The court noted that the news articles and broadcasts presented by Kingman contained factual accounts of the background of the case and various courtroom proceedings occurring after Kingman's arrest. While the reports spoke of the "brutality" of the injuries inflicted on Overby, the court found that the information was not reported in an inflammatory manner, that terms such as "allegations," "accusations," and "charges" were used, and that the reports were not calculated to improperly sway public opinion against Kingman.

¶44 Nine of the ten articles provided by Kingman were from the *Bozeman Daily Chronicle*; one article was from a monthly publication entitled *The BoZone*; and the nine

28

broadcasts were from local television station KBZK. Based on the statistics provided by Kingman, the District Court estimated that roughly half of the households in Gallatin County are exposed to the *Chronicle* on a daily basis. Furthermore, the KBZK news report, in conjunction with the station's sister affiliate in Butte, reaches approximately 100,000 viewers; however, the court had insufficient information to estimate how many individuals eligible to serve as jurors in Gallatin County are exposed to KBZK news reports daily. The court noted that six of the *Chronicle* articles and six of the KBZK reports were printed/aired in the first 36 days following the incident, that the remaining articles and broadcasts were printed/aired in late 2008 and early 2009, and that trial was set for November 12, 2009.

¶45 Finally, as to ostensible adverse community reaction, the District Court rejected Kingman's argument that the fundraising efforts to assist Overby were indicative of, and fostered, a community-held perception that Overby was an innocent victim and Kingman was a brutal, unprovoked attacker. The court observed that Kingman had presented no evidence in support of this contention. Turning to the juror questionnaires, the court noted that 27 of the 150 respondents had marked "yes" to the question: "As a result of what you have seen, heard, read or discussed about this case, have you formed an opinion that would affect your ability to serve as a juror?" (As noted, 108 marked "no" and 15 left the question blank.) The court found this percentage of affirmative responses to be insufficient to establish that Kingman could not receive a fair and impartial trial in Gallatin County, particularly since the question provided no insight into what the juror's opinion was, why the juror believed that opinion would affect his or her ability to serve,

29

and whether the juror could lay that opinion aside and render a verdict based on the evidence presented. The questionnaire also asked those respondents who had read, heard, seen, or discussed the case to "please tell us everything you think you know about this case, in as much detail as possible." In response, some of the prospective jurors indicated they had heard a great deal about the case, and they described what they knew using terms that had been utilized in news reports, such as "attack," "stabbed," and "the victim was injured and unconscious." Kingman claimed these responses showed that numerous jurors actually had formed an opinion about the case and about his guilt which affected their ability to be impartial, even if they were not aware that they had formed such an opinion. The District Court rejected this argument, however, observing that while 96 of the 150 prospective jurors indicated they had read, seen, or heard something about the case, 108 respondents indicated they had not formed an opinion that would affect their ability to serve. The court refused to infer that mere knowledge of the case, even in some detail, equates to prejudice against Kingman or a fixed opinion about his guilt.

¶46    For these reasons, the District Court concluded that Kingman had failed to show a reasonable possibility that he could not receive a fair and impartial trial in Gallatin County due to prejudicial pretrial publicity. Kingman disagrees with the court's analysis and argues that several factors mandate a finding of presumed prejudice.

¶47    First, Kingman contends that the circumstances of the fight, in which he inflicted extensive injuries with his hands and then expressed pleasure about having done so, would reasonably elicit revulsion and antipathy. He asserts that the news accounts used evocative and emotional language to describe the events, emphasized the graphic details

30

of Overby's injuries, and presented a "hackneyed narrative" in which Kingman was portrayed as a "dangerous outsider" who disturbed the tranquility of a small community by committing a "brutal," "vicious," and "savage" crime against an esteemed local. Having reviewed the articles and broadcasts, however, we cannot agree that the media reports were as slanted and inflammatory as Kingman suggests. Although the reports describe a brutal and gruesome beating, the incident is not reported in a sensationalized manner. The reports do not go beyond an objective dissemination of information, nor do they inflame an already angry populace. *Cf. Coburn*, 202 Mont. at 30-31, 655 P.2d at 507. The reports do not take a position on Kingman's guilt. *Cf. Dryman*, 127 Mont. at 582-83, 269 P.2d at 797-98. They use terms such as "allegations," "accusations," and "charges." Most of the complained-of reports were published or broadcast within the first few weeks after the fight, over a year before Kingman's trial. Notably, a subsequent *Chronicle* article, dated May 28, 2009, reports Kingman's side of the story and his claim that Overby was the aggressor and Kingman acted in self-defense. While Kingman speculates that the impact of the early publicity had not appreciably diminished by the time of trial, we do not agree that this is a case like *Dryman*, where the impact of the news items was still felt more than a year after they were published. *See* 127 Mont. at 586, 269 P.2d at 799 (opinion of the Court), 127 Mont. at 591, 269 P.2d at 802 (Anderson & Angstman, JJ., dissenting). Contrary to Kingman's characterizations, the September and October 2008 media reports were not so provocative as to leave the Gallatin County citizenry chomping at the bit for 13 months to exact retribution on Kingman.

¶48     Second, Kingman observes that his "dramatic confession" in the voicemail left for Zane was reported in three newspaper articles and one television broadcast (all in late September and early October 2008). He asserts that this is the type of information which, like the videotaped confession in *Rideau*, readers and viewers could not reasonably be expected to shut from sight. He also points out that even where the information reported by the media is "factual" (as opposed to editorializing), it may still have a prejudicial impact. He maintains that his "confession" was blatantly prejudicial.

¶49     It is true that "factual" information may create prejudice in the community. *See e.g. Dryman*, 127 Mont. at 590, 269 P.2d at 801 (the "fact" that Dryman had pleaded guilty was one of the main reasons that the widespread and deep-seated opinion in Toole County was that he was guilty and should be hanged); *Devlin*, ¶ 22 (factual information may be reported in an inflammatory manner, and the reporting of factual information may be inflammatory in light of the particular circumstances). It is also true that exposing prospective jurors to a defendant's recorded "confession" raises concerns about whether the jurors can shut out this information and judge the defendant impartially. *Rideau*, 373 U.S. at 726, 83 S. Ct. at 1419. We are not persuaded here, however, that the reporting of Kingman's voicemail message justifies presumed prejudice. It should be noted that the message was not broadcast or printed repeatedly. One of the *Chronicle* articles cited by Kingman does not quote from his message at all, and a second article purports to recite information contained in "charging documents." The third article, dated September 20, 2008, and the KBZK broadcast of the same date both report that the prosecution played the voicemail message at Kingman's bail hearing. The article quotes a significant portion

32

of what Kingman said, and the KBZK broadcast (a copy of which is contained in the record) includes a somewhat indiscernible snippet of the message being played at the bail hearing, with Kingman quoted as saying: "I was just like crack, crack, crack, crack on this *******. I felt, oh god it felt so good. So good. Call me back when you get this." In *Rideau*, however, the Supreme Court emphasized the inherently prejudicial impact of repeatedly viewing Rideau confess in detail during a 20-minute interrogation by the local sheriff. 373 U.S. at 724, 83 S. Ct. at 1418. The Court stated that

> it was a denial of due process of law to refuse the request for a change of venue, after the people of Calcasieu Parish had been exposed repeatedly and in depth to the spectacle of Rideau personally confessing in detail to the crimes with which he was later to be charged. For anyone who has ever watched television the conclusion cannot be avoided that this spectacle, to the tens of thousands of people who saw and heard it, in a very real sense *was* Rideau's trial—at which he pleaded guilty to murder. Any subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality.

*Rideau*, 373 U.S. at 726, 83 S. Ct. at 1419 (emphasis in original). Whereas the television broadcasts of Rideau showed him admitting, under questioning by authorities, that he had committed three crimes—hence the Supreme Court's observation that this "in a very real sense *was* Rideau's trial"—the broadcast here involved an excerpt of a voicemail message in which the speaker engaged in a drunken and "adrenaline-hyped" rant to a friend. Thus, purely as a qualitative matter, the present case is distinguishable from *Rideau* in that Kingman's voicemail message cannot fairly be characterized as his "trial" to those who heard it. But more importantly, his "confession" during the message was not broadcast or printed "repeatedly and in depth." In fact, it was broadcast briefly, and only once, on television. Likewise, it was quoted only once in the newspaper (twice, if

33

one also considers the short quotations taken from "charging documents" in the second article).  Importantly, these instances occurred early on, and long before trial.  On these facts, we will not presume that the entire jury pool was prejudiced against Kingman.

¶50    Third, Kingman argues that the fundraising efforts for Overby are evidence that the community was inflamed by the pretrial publicity.  He quotes in part from *Maine v. Super. Ct. of Mendocino Co.*, 438 P.2d 372 (Cal. 1968), wherein the California Supreme Court observed:

> One of the victims, the girl, was discovered on a public road nearly unconscious with bullet wounds about her neck and head.  Her condition was critical and several complicated operations were performed to save her life.  Local citizens immediately organized a fund to help the girl's parents defray the medical expenses, and the Ukiah Daily Journal, the local newspaper, urged every citizen to contribute.  It is no small measure of the community's laudable warmth and generosity that a substantial sum was quickly raised, mostly in modest contributions.  We do not hold it to be an invariable rule that sympathy for a victim demonstrates antipathy to the alleged perpetrators of an offense.  But such pervasive civic involvement in the fate of a victim, particularly when the events all transpire in a relatively small community, is a strong indication that the venue should be changed.

*Maine*, 438 P.2d at 378-79 (footnote omitted).  In the present case, Overby's friends placed donation jars in several local bars and at Poor Richard's News on Main Street, set up a fund at Big Sky Western Bank, and organized a benefit in Big Sky that raised $5,800.  As Kingman notes, these fundraising activities are a tribute to the kindness and generosity of the people of Gallatin County.  Kingman has not shown, however, that they constitute such "pervasive civic involvement" in Overby's fate as to justify a presumption of communitywide antipathy toward Kingman.  There is no evidence that the media or Overby's friends "urged every citizen to contribute."  In fact, Kingman has produced no

34

evidence as to how many individuals provided contributions and how much of the community was involved in the fundraising. It bears repeating that "a motion for change of venue requires . . . fact-specific proof by the moving party." *Devlin*, ¶ 30.

¶51    Lastly, Kingman argues that the publicity's pervasiveness and prejudicial effect is evidenced by the 27 questionnaire respondents who marked that, as a result of what they had seen, read, heard, or discussed about the case, they had formed an opinion that would affect their ability to serve as jurors. He also posits that the 96 respondents who indicated that they had seen, read, or heard something about the case "could be predisposed toward conviction." Regarding this latter point, he asserts that "social science has repeatedly correlated potential jurors' exposure to pretrial publicity and prejudgment of criminal defendants."[3] Even if such a correlation exists, however, it does not justify presuming in this case that Kingman could not obtain an unbiased jury in Gallatin County. Showing that some of the potential jurors know about the case does not suffice to demonstrate that an irrepressibly hostile attitude pervaded the community. *See Stafford*, 34 F.3d at 1567. Moreover, Kingman reads way more into the questionnaire responses than is warranted. Nearly a third of the respondents indicated that they had not seen, read, or heard anything about the case, and nearly three-quarters of the respondents indicated that they had not formed an opinion that would affect their ability to serve as jurors. These numbers belie a presumption that the entire jury pool was corrupted by anti-Kingman press coverage. Even with regard to the 27 persons who indicated that they *had* formed an opinion, this

---

[3] For this proposition, Kingman cites Christina A. Studebaker and Steven D. Penrod, *Pretrial Publicity: The Media, the Law, and Common Sense*, 3 Psychol., Pub. Policy and L. 428, 434-35 (1997).

question is not very useful in assessing prejudice. As the District Court noted, the question provides no insight into what the juror's opinion was, why the juror believed that opinion would affect his or her ability to serve, and whether the juror could lay that opinion aside and render a verdict based on the evidence presented. As we have pointed out before, it is not required that jurors be totally ignorant of the facts and issues or that jurors be without any impression or opinion as to the merits of the case. Indeed, the mere existence of a preconceived notion as to the accused's guilt or innocence, without more, is insufficient to rebut the presumption of a prospective juror's impartiality. The relevant question is whether the juror can lay aside his or her impression or opinion and render a verdict based on the evidence presented in court. *Devlin*, ¶ 32. The questionnaire responses here do not show that the jury pool was firmly predisposed to convict Kingman.

¶52 Kingman raises a few other considerations, none of which merits discussion. In light of all the facts and circumstances discussed above, we hold under the United States Constitution and the Montana Constitution that the District Court did not abuse its discretion in denying Kingman's motion to change venue based on presumed prejudice. Kingman's evidence of pretrial publicity and community sentiment does not even come close to meeting the high standard necessary to establish such prejudice. There is no indication that the Gallatin County populace was incensed. Nor is there any evidence of "a circus atmosphere or lynch mob mentality" directed at Kingman. He has not shown that an irrepressibly hostile attitude pervaded the jury pool. More to the point, he has not demonstrated that the complained-of publicity effectively displaced the judicial process

36

and dictated the community's opinion as to his guilt or innocence. Indeed, Kingman's claim of presumed prejudice is substantially refuted by the fact that he ultimately was *acquitted* of the more serious charge of attempted deliberate homicide and convicted instead of the lesser included offense of aggravated assault. "It would be odd for an appellate court to presume prejudice in a case in which jurors' actions run counter to that presumption." *Skilling*, 130 S. Ct. at 2916.

¶53 ***Issue 2. Whether Kingman's right of dignity under Article II, Section 4 of the Montana Constitution was violated by the prosecutor's arguments during sentencing.***

¶54 At the sentencing hearing, the prosecutor recommended the maximum sentence of 20 years imprisonment. As justification, he pointed to the "savage nature" of the beating, the severity of the injuries suffered by Overby, Kingman's "animalistic voice" describing in the voicemail message how much joy and satisfaction he felt, and the fact that the next morning Kingman asked the physician who attended to his injured hand (and who later testified at trial) "whether he would be able to punch again." The prosecutor also cited Kingman's criminal history, the violent nature of some of his past offenses, his failure to comply with the terms and conditions of his previous probation, and the need to protect the public. Finally, the prosecutor discussed the psychological evaluations of Kingman, which found that he had problems with anger and impulse control, especially when under the influence of alcohol or drugs. Then, to sum up his argument, the prosecutor stated:

> The basis for this recommendation is very simple, and it's based upon a very simple concept. Some animals need to be caged. Some creatures are so dangerous that society can't risk them being amongst us. What Mr. Kingman did in September of 2008 is inhuman. No one does that. He does not need to be treated with any sort of respect or admiration.

37

When he's over at the Detention Center acting up, pounding on walls, breaking sprinkler heads,[4] he's acting as the State has just characterized him—as a caged animal. And that's where he needs to be.

¶55 Defense counsel, as noted, took issue with the prosecutor's characterizations. He argued that it is downright offensive and wrong to label anyone as "an animal that needs to be locked up in a cage." Counsel noted that "[p]eople in this country are afforded at least some measure of human dignity. And regardless of what they've done, . . . they're still people." Counsel then argued for less than the maximum sentence in light of the fact that Kingman initially had attempted to walk away from the altercation with Overby but Overby continued to provoke and shove Kingman from behind. Counsel asserted that "this is not a case of Mr. Kingman walking down the street and randomly attacking someone. This is a case of self-defense gone too far." Counsel then went on to discuss Kingman's difficult family background, his problems with chemical dependency, and the findings in the psychological reports that his personality disorders are treatable. Counsel argued that Kingman's potential to be a productive member of society would be wasted if he were given the maximum sentence. Counsel recommended five years. Kingman then gave a statement in which he apologized to Overby and Overby's family.

¶56 In pronouncing sentence, the District Court acknowledged Kingman's personality disorders and the positive prognosis for rehabilitation. The court also noted Kingman's willingness to take responsibility for his actions and his honest expressions of remorse for what he had done. Nevertheless, the court imposed the maximum sentence of 20 years at

---

[4] There was testimony earlier in the hearing that Kingman had punched and kicked cell doors, broken a sprinkler head, and pushed a guard at the Detention Center.

38

Montana State Prison. In so doing, the court explained that none of the factors identified by Kingman and his counsel mitigated his culpability. "The circumstances of this crime are outrageous; they're aggravated; they are intolerable. They cannot be mitigated or explained by the defendant's social history or excused by his use or abuse of alcohol and drugs." The court observed that Kingman's "actions were deliberate. He did not walk away when he could have. He totally lost control of himself, and he continued to beat Mr. Overby after he was down on the ground." Moreover, after the attack, Kingman "was not horrified by what he had done or how he had responded. Instead, he was thrilled with the effect of what he did and how he continued to beat Paul Overby like 'Rocky punching wet meat.'" The court also factored into its consideration the severity of the injuries inflicted by Kingman and his "significant criminal history" involving violence and anger mixed with drug and alcohol abuse. In addition, the court noted Kingman's repeated failure to comply with the terms and conditions of his previous probation and his instances of misconduct and property damage while incarcerated on the current offense. The court found that Kingman "cannot currently function in the community," he "is a danger to any community in which he stays with his anger uncontrolled and his alcohol and drug abuse unchecked," and he "requires long-term incarceration to protect" the victim and society.

¶57 Kingman contends on appeal that in order to secure the maximum sentence, the prosecutor "dehumanized" Kingman by referring to him as an "animal" that "needs to be caged." Kingman contends that this violated his right to human dignity under Article II, Section 4 of the Montana Constitution, which states: "The dignity of the human being is

inviolable. . . ." Kingman requests that we vacate his sentence and remand his case for resentencing before a different judge.

¶58 At the outset, certain of the prosecutor's remarks at the sentencing hearing clearly pushed the bounds of proper argument. The prosecutor's statement that Kingman "does not need to be treated with any sort of respect" is both wrong and inappropriate, and we categorically reject it. Moreover, the prosecutor's suggestion that the court ought to view Kingman as an "animal" needing to be "caged" is likewise inappropriate. As we have recognized, treatment which degrades or demeans persons, that is, treatment which deliberately reduces the value of persons, and which fails to acknowledge their worth as persons, directly violates their dignity. *Walker v. State*, 2003 MT 134, ¶ 81, 316 Mont. 103, 68 P.3d 872. " 'The reformation and prevention functions of punishment both express the community's disrespect for *the actions* of the criminal, but the processes of punishment must never disrespect *the core humanity* of the prisoner.' " *Walker*, ¶ 81 (emphases added) (quoting Matthew O. Clifford & Thomas P. Huff, *Some Thoughts on the Meaning and Scope of the Montana Constitution's "Dignity" Clause with Possible Applications*, 61 Mont. L. Rev. 301, 331 (2000)). These principles apply no less to the proceeding in which the appropriate punishment is determined, and argument which, in that context, deliberately reduces the value of the convicted defendant or disrespects the defendant's core humanity is improper.

¶59 That being said, we cannot agree with Kingman's premise that the prosecutor's remarks—"offensive" as they may have been—actually played any part in the District Court's decision to impose the maximum sentence. For one thing, defense counsel made

40

a point of arguing to the court that it could not sentence Kingman based on the notion that he is an "animal." Furthermore, in reviewing the prosecutor's recommendation, the court did not even acknowledge the "animal" remarks. The court observed:

> Chief Deputy County Attorney Whipple has argued that the case has to be considered under its own facts and circumstances, that this defendant is *a dangerous individual*, who has spent a number of years in and out of prison in California; who has a history of anger issues and severe drug and alcohol abuse and committed this crime while extremely intoxicated, that he has continued to *act out in anger* even while participating in counseling and receiving medication for his mental health issues. The State feels that it is imperative that he not have an opportunity to hurt anyone else. [Emphases added.]

Finally, the court's articulated reasons make it clear that the court based Kingman's sentence on the "heinous" and "outrageous" nature of the offense, the severity of the injuries inflicted on Overby, Kingman's initial "thrill" over what he had done, his criminal history, his pattern of violence and anger mixed with drug and alcohol abuse, and the danger that he posed to the community. These are all valid considerations when sentencing. *See* § 46-18-101, MCA; *State v. Rosling*, 2008 MT 62, ¶ 72, 342 Mont. 1, 180 P.3d 1102 (a sentencing court may consider evidence relating to the crime, the defendant's character, background history, mental and physical condition, and any other evidence the court considers to have probative force).

¶60 Kingman notes in his opening brief that he "claims no improper action on the part of the district court in regard to his sentencing." His claim, therefore, appears to be that when a prosecutor makes improper argument at sentencing, the defendant is entitled to be resentenced (by a different judge) even though the prosecutor's remarks had no influence on the trial court's decision to impose the concededly legal sentence that the defendant

received.  It is questionable whether such a rule would serve any remedial purpose.  But, in any event, we decline to adopt this rule in the circumstances presented here.

## CONCLUSION

¶61    The District Court did not abuse its discretion in denying Kingman's motion for change of venue.  Furthermore, Kingman is not entitled to be resentenced based on his dignity claim.

¶62    Affirmed.

/S/ JAMES C. NELSON

We Concur:

/S/ MIKE McGRATH
/S/ BETH BAKER
/S/ PATRICIA COTTER
/S/ MICHAEL E WHEAT
/S/ BRIAN MORRIS
/S/ JIM RICE